Appendix

LEXSEE 2007 U.S. DIST. LEXIS 63455

**ALEXANDER WILLIAMS, Plaintiff, -against- THE CITY OF NEW YORK POLICE DEPT., DETECTIVE HUBER DIXON SHEILD NO. 02530, DETECTIVE M. LAUREL, KINGS COUNTY DISTRICT ATTORNEY, MICHELLE SIEGAL, Defendants.**

**06 Civ. 6053 (BMC)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 63455*

**August 24, 2007, Decided
August 27, 2007, Filed**

**NOTICE:** NOT FOR PUBLICATION

**COUNSEL:** [*1] Alexander Williams, Plaintiff, Pro se, Brooklyn, NY.

For Det. Hubert Dixon, Shield No. 02530, Det. M. Laurel, ADA Michelle Siegal, Kings County District Attorney's Office, Defendants: Amy Nkemka Okereke, LEAD ATTORNEY, New York City Law Department, Special Federal Litigation Division, New York, NY.

For City Of New York, Interested Party: Amy Nkemka Okereke, LEAD ATTORNEY, New York City Law Department, Office of the Corporation Counsel, Special Federal Litigation Division, New York, NY; Michael Chestnov, Assistant Corporation Counsel, The City of New York, Law Department, New York, NY.

**JUDGES:** Judge Brian M. Cogan.

**OPINION BY:** Brian M. Cogan

**OPINION**

**MEMORANDUM DECISION AND ORDER**

COGAN, District Judge.

This is a *§ 1983* action in which the complaint of the plaintiff *pro se*, liberally construed, asserts claims for false arrest and malicious prosecution. In essence, he alleges that the police defendants arrested him on a complaint that was actually the result of a personal grudge against him held by the complainant, and when the complainant's boyfriend came to the police station to exonerate him, the police refused to listen. The case was pre-

sented to a grand jury and plaintiff was indicted on 44 felony counts. He reached [*2] a plea agreement with the District Attorney, pleading guilty to disorderly conduct in exchange for dismissal of the felony charges.

He now sues the arresting officers, the Police Department as their employer, and the prosecutor who presented the case to the grand jury. Defendants have moved to dismiss under *Rule 12(b)(6)*; plaintiff has not opposed, despite the Court *sua sponte* giving him an extension to do so. However, he did put in a letter in opposition to defendants' request for a premotion conference, and the Court has considered it in opposition to defendants' motion.

Plaintiff cannot prevail on his false arrest claim because he pled guilty to disorderly conduct. This creates two legal hurdles. First, it conclusively establishes that there was probable cause for his arrest. See *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)*. Second, recovery of damages in this action would violate the rule in *Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L. Ed. 2d 383 (1994)*, because such a recovery would effectively invalidate the conviction for disorderly conduct.

Plaintiff's guilty plea also precludes an action for malicious prosecution. An essential element of that claim is that the criminal proceeding [*3] must have terminated in plaintiff's favor. See *Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. 2004)*. An agreement to plead does not constitute a favorable termination. *Id. at 286-88; Coakley v. MacPherson, 49 F. Supp. 2d 615, 621-23 (S.D.N.Y. 1999)*, aff'd, *234 F.3d 1261 (2d Cir. 2000)*.

Plaintiff asserts in his letter that the disorderly conduct plea does not carry jail time and that it was not one of the original charges brought against him. However,

Case 1:07-cv-05581-SHS    Document 30-2    Filed 11/30/2007    Page 3 of 43

2007 U.S. Dist. LEXIS 63455, *    Page 2

plaintiff does not dispute that the plea was in exchange for shopping the felony charges and arose out of the same incident. The fact that he pled to a lesser charge does not dissipate the effect of his guilty plea.

In addition, plaintiff's claims against the prosecutor are barred by absolute immunity. His claim is based wholly on grand jury conduct, i.e., that the prosecutor prevented the complainant's boyfriend from testifying before the grand jury by threatening him if he tried to do so, and that she presented false evidence to the grand jury. That is squarely within the prosecutor's function and this is subject to absolute immunity. See *Hill v. City of New York, 45 F.3d 653, 661-62 (2d Cir. 1995)*.

## CONCLUSION

For the foregoing reasons, **[*4]** plaintiff's *§ 1983* claims and dismissed with prejudice. I decline to retain jurisdiction over plaintiff's supplemental state claims and those are dismissed without prejudice. The Clerk is directed to mail a copy of this decision to the plaintiff *pro se* and close this file.

## SO ORDERED.

/S/ Signed by Judge Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York

August 24, 2007

LEXSEE 1998 U.S. DIST. LEXIS 20142

**JALAH SEALEY, Plaintiff, -against- STUART FISHKIN, THE NEW YORK CITY POLICE DEPARTMENT, and THE CITY OF NEW YORK, Defendant.**

**96 CV 6303 (RR)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 20142*

**December 2, 1998, Decided**

**DISPOSITION:** [*1] All of plaintiff's claims against the New York City Police Department and the City of New York dismissed with prejudice. Plaintiff's claims against Officer Fishkin for false arrest and false statements to parole officials dismissed without prejudice to refiling.

**COUNSEL:** JALAH SEALEY, Plaintiff, Pro se, Comstock, New York.

Jeffrey Weiss, Assistant Corporation Counsel, THE HONORABLE MICHAEL D. HESS, Corporation Counsel of the City of New York, New York, New York, for Defendants.

**JUDGES:** REENA RAGGI, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** REENA RAGGI

**OPINION**

Memorandum and ORDER

RAGGI, District Judge:

Plaintiff pro se Jalah Sealey, who is presently incarcerated by New York State for violating parole, sues New York City, its Police Department, and Police Officer Stuart Fishkin for injuries sustained in connection with his January 4, 1994 arrest. Specifically, Sealey contends that Officer Fishkin arrested him without probable cause and then lied about the circumstances of his arrest to parole officials. He further complains that, in the course of the arrest, Officer Fishkin used excessive force. Sealey asserts that after his arrest, unnamed New York City officers subjected him to cruel [*2] and unusual treatment.

Defendants move for dismissal of all claims against the New York City Police Department on the grounds that that party is not a suable entity. They further move for summary judgment in favor of New York City on all claims raised and in favor of Officer Fishkin on plaintiff's claims of false arrest and false statements made to parole officials. Plaintiff opposes this motion and moves to amend his complaint to name three additional defendants: Charles Lopresti, Kevin Brunner, and Sergeant Robert Hugel. Having carefully reviewed the submissions of the parties, the court concludes that defendants' dispositive motions should be granted and that plaintiff's motion to amend should be denied. This leaves only plaintiff's excessive force claim against Officer Fishkin for trial on the merits.

**Factual Background**

In considering defendants' motions for dismissal and summary judgment, this court views the record before it in the light most favorable to the plaintiff. See *Gubitosi v. Kapica, 154 F.3d 30, 31 (2d Cir. 1998)*.

On December 30, 1993, defendant Jalah Sealey was paroled from New York State prison. [1] Shortly after 2:00 p.m. on January 4, 1994, he [*3] was approached by two police officers, Stuart Fishkin and Charles Lopresti, in the vicinity of 191st Street and Jamaica Avenue in Queens, New York. [2] When Sealey saw that the two officers had their weapons drawn, he panicked and ran toward his home a few blocks away. The officers pursued and subdued him, whereupon they began to beat him with a walkie-talkie and kick him. Even after plaintiff was handcuffed, the arresting officers as well as other police who had arrived on the scene continued the assault.

1    The records before the court suggest that Sealey had been incarcerated for attempted murder.

2    Arrest reports indicate that the officers suspected Sealey of drug trafficking. In fact, no drugs were seized in connection with petitioner's arrest.

Sealey was initially taken to the 103rd precinct and thereafter to Jamaica Hospital Medical Center for treatment of his injuries. [3] In support of his claim of cruel and unusual treatment, Sealey asserts that unidentified officers required him to leave the hospital [*4] dressed only in his underwear and hospital gown. After making Sealey stand for several minutes in the snow while they pretended to search for their car keys, the officers placed petitioner in the back seat of their car and threw cold water on him, after which they drove to central booking with the windows rolled down.

3    Hospital records indicate that Sealey sustained various cuts and bruises to his face. A CAT scan revealed no internal injuries. He was released without any medication being prescribed.

Officer Fishkin was also treated at the hospital for a wrist sprain and a small cut on his nose and released the same day.

At central booking, Sealey was charged with Assault in both the Second and Third Degree, N.Y. Penal Law §§ 120.00[1], 120.05[3] (McKinney 1998), for allegedly assaulting the arresting officers, and with Resisting Arrest, N.Y. Penal Law § 205.30 (McKinney 1988). [4] Bail was set at $ 500 and Sealey was, in fact, released on January 10, 1994. On January 18, 1994, however, he was re-incarcerated [*5] on a parole violation warrant based on the January 4, 1994 arrest.

4    On March 16, 1994, the prosecution abandoned the charge of second-degree assault.

Soon thereafter, Sealey filed a complaint with the Civilian Complaint Review Board against Officers Fishkin, Lopresti, and Kevin Brunner. The Board issued a report on June 14, 1995 exonerating Officer Fishkin of any wrongdoing in connection with plaintiff's arrest and finding the allegations against Officers Lopresti and Brunner [5] unsubstantiated.

5    Brunner was accused of using abusive language toward Sealey

On January 31, 1995, Sealey pleaded guilty to Disorderly Conduct, N.Y. Penal Law § 240.20 (McKinney 1988), in satisfaction of all outstanding charges from January 4, 1994. He was sentenced to time served. On March 15, 1995, he pleaded guilty to violating his parole, which resulted [*6] in his continued incarceration.

On December 26, 1996, Sealey's § 1983 claim was filed with this court.

## Discussion

### I. Police Department Motion to Dismiss

Plaintiff has made a pleading error common to pro se litigants: he has named both the City of New York and one of its agencies, the New York City Police Department, as defendants in this case. The New York City Charter provides that "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." New York City Charter, Chapter 16, § 396. Accordingly, this court hereby dismisses plaintiff's complaint against the New York City Police Department since that entity cannot be sued independently of the City. See Bailey v. New York City Police Dep't, 910 F. Supp. 116, 117 (E.D.N.Y. 1996); Wilson v. City of New York, 800 F. Supp. 1098, 1101 (E.D.N.Y. 1992); East Coast Novelty Co. v. City of New York, 781 F. Supp. 999, 1010 (S.D.N.Y. 1992).

### II. Summary Judgment

To prevail on a motion for summary judgment, a party must show that "there is no genuine [*7] issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). In considering such a motion, a district court may not assess credibility or resolve factual disputes. See Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994). Instead, it must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. See, e.g., Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995). Nevertheless, when a moving party can point to a lack of proof as to one or more essential elements of a claim on which the opposing party will bear the burden at trial, the opposing party can avoid summary judgment only if it comes forward with admissible evidence sufficient to permit a reasonable fact finder to rule in its favor. See Celotex v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Quarantino v. Tiffany & Co., 71 F.3d at 64; Capital Imaging Assocs. v. Mohawk Valley Medical Assocs., 996 F.2d 537, 542 (2d Cir. 1993).

### A. Monell Claims Against the City of New York

[*8] The City of New York moves for judgment in its favor on all of plaintiff's claims on the ground that plaintiff has failed to adduce sufficient evidence to dem-

onstrate that his constitutional rights were violated as the result of any official city policy or custom.

A municipality is liable under § 1983 only when the plaintiff's constitutional injury resulted from an official policy, custom, or practice of the municipality. See *Board of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997); Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-91, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).* A municipal policy or practice may be established by reference to a formal rule or widely-practiced custom. It may, however, also be inferred from circumstantial proof, such as evidence that the municipality was deliberately indifferent to the need to train its employees as to proper conduct in situations that could implicate persons' constitutional rights. See *City of Canton v. Harris, 489 U.S. 378, 388-92, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989); Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir.* [*9] *1991).* The mere allegation that a municipality failed to train its employees properly, unsubstantiated by any evidence, is insufficient to establish a municipal custom or policy. See *Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993).* Neither is proof of a single incident involving only actors below the policymaking level sufficient to raise an inference of the existence of a custom or policy. See *City of Canton v. Harris, 489 U.S. at 387; Dwares v. City of New York, 985 F.2d at 100.*

In this case, plaintiff sues in connection with a single arrest incident. The actions in dispute were all taken by individuals below the policymaking level. Nevertheless, plaintiff asserts that New York City is liable for his constitutional injuries because it fails to train police officers adequately to ensure against their false arrest of innocent persons, their use of excessive force, or their infliction of cruel and unusual treatment. In fact, he adduces no evidence to support this claim of municipal liability.

Instead, he points only to the fact that a number of civilian complaints have been filed against Officer Fishkin. The officer's Civilian Complaint Review Board history [*10] report, however, shows that none of these claims was ever substantiated. Thus, this evidence would not suffice to prove deliberate indifference by the city to the need for any further training of this officer in particular or police officers in general. See *Marcel v. City of New York, 1990 U.S. Dist. LEXIS 4094, No. CV 88-7017, 1990 WL 47689 at *8-9 (S.D.N.Y. Apr. 11, 1990)* (unsubstantiated CCRB complaints do not support claim of municipal failure to train); *Law v. Cullen, 613 F. Supp. 259, 262-63 (S.D.N.Y. 1985)* (same).

Plaintiff further complains that Officer Fishkin was not disciplined adequately for his conduct in this case. This conclusory assertion fails to address the fact that the Civilian Complaint Review Board expressly exonerated the officer of any wrongdoing in connection with plaintiff's arrest. In any event, the City's purported failure to discipline an officer after he causes an alleged constitutional injury cannot be viewed as the cause of that injury.

Finally, plaintiff complains that he has not had adequate discovery to prove his claim against the City. Discovery in this case was ably supervised by Magistrate Judge Steven M. Gold. He ensured that plaintiff received all Police Department [*11] documents regarding plaintiff's arrest, the underlying parole revocation file, all Police Department and Civilian Complaint Review Board files relating to Officer Fishkin, and various police academy training materials. The court rejects the argument that further discovery is warranted in this case.

The complaint against the City of New York is dismissed in its entirety.

**B. Arrest Without Probable Cause**

Plaintiff submits that he was arrested on January 4, 1994 without probable cause to believe he had committed any crime, thereby violating the *Fourth Amendment.* See *Beck v. Ohio, 379 U.S. 89, 91, 13 L. Ed. 2d 142, 85 S. Ct. 223 (1964)* ("Whether [an] arrest was constitutionally valid depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it."). Defendants move for summary judgment on this claim citing plaintiff's subsequent conviction on his own guilty plea to disorderly conduct as evidence that there was probable cause to arrest him on January 4, 1994. This court agrees.

The law is clear that if, after arrest, a plaintiff is convicted of any of the charges against him, that conviction is "'conclusive evidence of probable cause'" [*12] as long as it is not subsequently reversed. *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)* (quoting *Broughton v. State, 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 95, 335 N.E.2d 310 (1975)).* Thus, in *Heck v. Humphrey, 512 U.S. 477, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994),* the Supreme Court held that a plaintiff whose § 1983 claim of false arrest called into question the lawfulness of a subsequent conviction could not pursue the suit for damages until he succeeded in having the conviction reversed on direct appeal or invalidated in a collateral proceeding. *Id. at 486-87.*

Plaintiff seeks to avoid the adverse result mandated by these cases by noting that he pleaded guilty to disorderly conduct, a lesser charge than the assault for which he was initially arrested. The distinction does not help him. See *Roundtree v. City of New York, 778 F. Supp. 614, 619 (E.D.N.Y. 1991)* (holding that a plea of guilty to lesser charge bars § 1983 action for arrest without probable cause); *Keyes v. City of Albany, 594 F. Supp. 1147*

*(N. D.N.Y. 1984)* (holding that plaintiff who was arrested for assault but who pleaded guilty to disorderly conduct could not pursue *§ 1983* action for **[*13]** arrest without probable cause). A plaintiff suing for false arrest must show that the police lacked probable cause to arrest him for any unlawful conduct. By pleading guilty to disorderly conduct, plaintiff necessarily acknowledged that he was engaged in some unlawful activity for which the police could properly take him into custody. Thus, as long as that conviction stands, plaintiff cannot pursue a *§ 1983* claim for false arrest. See *Heck v. Humphrey, 512 U.S. at 486-87.* [6] Accordingly, the court dismisses plaintiff's false arrest claim against all defendants without prejudice to refiling against Officer Fishkin if the underlying judgment of conviction for disorderly conduct is ever vacated or invalidated.

> 6  In opposing defendants' motion for summary judgment, plaintiff does assert that his guilty plea was not knowingly and voluntarily entered. That claim, however, cannot be entertained by this court in a *§ 1983* suit. Rather, plaintiff must pursue state court avenues of direct and collateral review and, if appropriate, a federal petition pursuant to *28 U.S.C. § 2255 (1994 & Supp. 1998).*

**[*14]** C. False Statements Leading to Violation of Parole

In a variation on his false arrest claim, Sealey complains that Officer Fishkin lied to parole officials about the circumstances of his January 4, 1994 arrest thereby resulting in his unjust re-incarceration. Here again, defendants cite Sealey's guilty plea at the parole proceedings as a bar to his pursuit of this aspect of his *§ 1983* claim. The court agrees.

Plaintiff's Exhibit 7 is the Parole Violation Report in his case. It indicates that plaintiff pleaded guilty to resisting arrest and that this was the factual basis relied on to remand him to jail for violating his parole. Under such circumstances, Heck v. Humphrey precludes him from suing for damages under *§ 1983* unless and until he succeeds in establishing the invalidity of his parole revocation in an appropriate state or federal proceeding. See *McGrew v. Texas Bd. of Pardons & Paroles, 47 F.3d 158, 160-61 (5th Cir. 1995)* (applying Heck to *§ 1983* action for damages in connection with parole revocation); *Zupan v. Brown, 5 F. Supp. 2d 792 (N.D. Cal. 1998)* (same); *Douglas v. New York State Div. of Parole, 1998 U.S. Dist. LEXIS 1604 at \*5, 97-CV-40 (N.D.N.Y.* **[*15]** *Feb. 10, 1998)*(same); see also *Spencer v. Kemna, 523 U.S. 1, 118 S. Ct. 978, 988-90, 140 L. Ed. 2d 43 (1998)*(Souter, J. concurring) (assuming applicability of Heck v. Humphrey to *§ 1983* claims necessarily challenging validity of parole revocation confinements).

The court hereby dismisses against all defendants that part of plaintiff's complaint seeking damages in connection with his parole revocation proceeding without prejudice to refiling against Officer Fishkin if Sealey satisfy the conditions set forth in Heck v. Humphrey.

III. Motion to Amend

A liberal reading of plaintiff's papers in opposition to defendants' motion suggests that he is looking to amend his complaint to add Officers Charles Lopresti and Kevin Brunner and Sergeant Robert Hugel as defendants in this action. Plaintiff asserts that he did not seek to add these individuals sooner as he did not expect discovery to end so abruptly in his case.

*Rule 15(a) of the Federal Rules of Civil Procedure* provides that leave to amend "be freely given when justice so requires." *Fed. R. Civ. P. 15(a).* Nevertheless, a court may deny leave to amend if the proposed amendment would be futile. See *American Express* **[*16]** *v. Robinson, 39 F.3d 395, 402 (2d Cir. 1994).* This is certainly the case with any claims plaintiff might wish to pursue against the three proposed defendants for false arrest. Such claims could not be brought unless and until plaintiff had his criminal conviction reversed or invalidated. See *Heck v. Humphrey, 512 U.S. at 486-87.* To the extent plaintiff seeks to sue these proposed defendants, either directly or as supervisors, for the use of excessive force or cruel and unusual treatment, his claims would be barred by the statute of limitations.

*Section 1983* claims brought in New York are governed by a three-year statute of limitations. See *Owens v. Okure, 488 U.S. 235, 250-51, 102 L. Ed. 2d 594, 109 S. Ct. 573 (1989); Soto v. Brooklyn Correctional Facility, 80 F.3d 34, 35 (2d Cir. 1996).* The excessive force and mistreatment alleged by plaintiff all occurred on January 4, 1994. Thus, he had until January 4, 1997 to sue those he considered responsible for his injuries. It was not until fifteen months beyond this statutory period, however, in his April 10, 1998 Memorandum in Opposition to defendants' motions, that plaintiff proposed to amend his complaint by adding new **[*17]** defendants. This amendment must be rejected as untimely unless it can be found to relate back to December 26, 1996, the date of the original pleading.

Pursuant to *Rule 15(c)(3),* an amended complaint adding new parties will relate back to the date of the original complaint only if it can be shown that the party to be named "(A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining his defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been

brought against the party." *Fed. R. Civ. P. 15(c)(3)*. Plaintiff cannot satisfy the "mistake" prong of the rule.

To establish "mistake" under *Rule 15(c)(3)*, a plaintiff must show either a factual mistake as to the name of the party to be sued or a legal mistake concerning the requirements of the cause of action. See *Soto v. Brooklyn Correctional Facility, 80 F.3d at 35-36; Cornwell v. Robinson, 23 F.3d 694, 705 (2d Cir. 1994)*. A plaintiff's lack of knowledge as to a party's identity cannot, however, be characterized as a "mistake." See *Barrow v. Wethersfield Police Dep't, 66 F.3d 466,* **[*18]** *470 (2d Cir. 1995)*, modified, *74 F.3d 1366 (1996)*. In Barrow, plaintiff sued the Wethersfield Police Department for injuries sustained as the result of excessive force by unidentified police officers. Thereafter, he sought to amend his complaint to name six officers as individual defendants. The court rejected the amendment as untimely finding that it "did not correct a mistake in the original complaint, but instead supplied information Barrow lacked at the outset." Id.

Sealey's situation is analogous to that of the plaintiff in Barrow. In proposing to add Officers Lopresti and Brunner and Sergeant Hugel to the complaint, he does not seek to correct any mistake in the original pleading. He seeks only to add new parties. Indeed, Sealey may have even less excuse for his original omission than the

plaintiff in Barrow since the 1995 Civilian Complaint Review Board report indicates that he knew Lopresti and Brunner's identities before he filed his original complaint.

The court hereby rejects the proposed amendment as barred by the statute of limitations.

## Conclusion

For the reasons stated herein, the court dismisses with prejudice all of plaintiff's claims **[*19]** against the New York City Police Department and the City of New York. It dismisses plaintiff's claims against Officer Fishkin for false arrest and false statements to parole officials without prejudice to refiling should plaintiff succeed in having either his conviction for disorderly conduct or his parole violation finding reversed or invalidated.

SO ORDERED.

Dated: Brooklyn, New York

December 2, 1998

REENA RAGGI

UNITED STATES DISTRICT JUDGE

LEXSEE 1999 U.S. DIST. LEXIS 9407

**FRANKLIN GRULLON, Plaintiff, - against - DELANO REID, JAMES HARIDO-POLOS, JOHN DOE # 1, aka "BRADLEY," JOHN DOE # 2 aka "JUNIOR," ED-WARD DELATORRE, EDWARD PIRAGLIA and NICHOLAS WITKOWICH, Defendants.**

**97 Civ. 7616 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1999 U.S. Dist. LEXIS 9407*

**June 21, 1999, Decided**
**June 24, 1999, Filed**

**DISPOSITION:**     [*1] Defendant's motion to dismiss complaint granted and Grullon's motions for preliminary injunction and to file amended complaint denied.

**COUNSEL:** FRANKLIN GRULLON, Plaintiff, Pro se, Petersberg, VA.

For Federal Defendants: SARAH THOMAS, Assistant US Attorney, Of Counsel, HONORABLE MARY JO WHITE, United States Attorney for the Southern District of New York, New York, NY.

For City Defendants: LAURA EBERSTEIN, Assistant Corporation Counsel, Of Counsel, HONORABLE MI-CHAEL D. HESS, Corporation Counsel of the City of New York, New York, NY.

For Nicholas Witkowich, Defendant: RONALD BER-MAN, ESQ., New York, NY.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

*OPINION*

**Sweet, D.J.**

Defendants Special Agent Delano A. Reid ("Agent Reid"), Special Agent James S. Haridopolos ("Agent Haridopolos") and Special Agent John F. Bradley, Jr. ("Agent Bradley") (collectively the "Federal Defendants"), all employees of the Bureau of Alcohol, To-bacco and Firearms ("ATF") (collectively the "Federal Defendants"), Defendants Police Officer Edward Dela-torre, and Police Officer Edward Peraglia ("Officer Pera-glia") (the "City Defendants"), and Defendant New York City Housing Authority [*2] Captain Nicholas Witko-wich ("Captain Witkowich") (collectively the "Defen-dants") have moved for summary judgment dismissing the amended complaint of Franklin Grullon, *pro se* ("Grullon"), pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. Grullon has moved for a preliminary injunction to bar his transfer from Low Security Correc-tional Institution, Allenwood ("Allenwood"). Grullon has also moved to amend his complaint.

On the facts and conclusions set forth below, the De-fendants' motions are granted, and Grullon's motion for injunctive relief is denied.

**Prior Proceedings**

Grullon commenced this proceeding on July 7, 1997 when he gave his papers consisting of a Rule 31(e) mo-tion seeking a return of property to the authorities to the Pro Se Office. Although the motion was stamped "re-ceived" by the Pro Se Clerk's Office on July 27, 1997, it was not docketed as a civil petition until October 15, 1997, and the government was not directed to respond prior to an order dated October 20, 1997.

Grullon's attorney, Marvin Schechter, retrieved some of the property that had been held by the govern-ment as evidence. The government released all remain-ing property to Grullon's [*3] mother, Antonia Estrella, on February 24, 1998, with the exception of photographs depicting Grullon and his associates holding guns and two address books that are being retained by the United

States Attorney's Office as evidence in the event of a *habeas corpus* action.

On February 18, 1998, an amended complaint was filed converting this action from one seeking return of the property to one seeking damages against the named defendants in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 29 L. Ed. 2d 619, 91 S. Ct. 1999 (1971), 42 U.S.C. § 1983, 28 U.S.C. § 1331* and *Rule 41(e) of the Federal Rules of Criminal Procedure.* Grullon has alleged that the Defendants violated his rights under the *Fourteenth Amendment* by conspiring to seize evidence from his place of business and "neglecting" to provide him with documents that would have assisted in the defense of his criminal case; violated his due process rights under the *Fifth Amendment* by "intentionally" "neglecting" to provide him with evidence seized from his place of business; violated his rights under the *Fourth Amendment* to be free from unlawful search [*4] and seizure by conducting a search of his place of business without a warrant; and violated his equal protection rights under the *Fourteenth Amendment* by selecting "a young hispanic male, to gain a narcotics conviction against him, where Defendants did not possess the evidence required to establish that he was distributing narcotics from his business."

Grullon moved for declaratory judgment on August 13, 1998 and a preliminary injunction barring his transfer from Allenwood on September 18, 1998. The Federal Defendants sought and obtained adjournments to respond to Grullon's application and on October 1, 1998, the Federal Defendants moved for summary judgment as did the City Defendants and Captain Witkowich. Grullon sought and obtained additional time to respond. On April 22, 1999, Grullon moved to amend and file an amended complaint.

The motions for summary judgment and preliminary injunction were marked submitted on March 31, 1999. The motion to amend the complaint was marked submitted on May 19, 1999.

### The Facts

### 1. The Criminal Investigation

On December 27, 1993, Agent Reid received information from a confidential informant that Grullon and others were [*5] engaged in armed narcotics trafficking with deliveries of the drugs sent by a car service. Further investigations by Agent Reid and others over the next six months led to an organization known as "New York One" that operated out of a radio base located at 970 Prospect Avenue, Apartment C, Bronx, New York. Agent Reid acted undercover during the investigation to purchase cocaine from the car service drivers.

Based on the information gathered during the investigations, the government obtained a search warrant for 970 Prospect Avenue and seven arrest warrants for individuals involved in the narcotics trafficking. On August 4, 1994, Agent Reid, along with Agent Bradley, Agent Haridopolos, and other ATF agents and officers from the New York City Housing Authority Policy ("NYHP"), executed the search warrant and arrest warrants.

During the execution of the search warrant, Agent Reid monitored conversations being conducted over the radio. Even though the agents had shut down the radio dispatch unit at 970 Prospect Avenue pursuant to execution of the search warrant, they continued to hear radio conversations indicating that New York One was operating from a second location, subsequently identified [*6] by one of the drivers who was arrested as being at Zerega and Westchester Avenues, Bronx, New York.

Some agents went to the Zerega Avenue location to attempt to locate additional individuals for whom the agents had arrest warrants. When they arrived, they discovered a store that appeared to be a livery car service with a sign on the front door stating, "New York One Car Service." The agents discovered a silver automatic .45 pistol lying in the street under a car parked in front of the store. Earlier that day when executing the search warrant at 970 Prospect Avenue, the agents had found a photograph of Grullon holding what appeared to be a silver pistol.

The agents entered the store to try to effect the remaining arrest warrants. They saw a list of individuals in the store's dispatch area that contained names of some of the subjects of the arrest warrants and a list of cars that included cars from which Agent Reid had previously purchased cocaine. Past the dispatch area was a door with a sign saying, "Office" and "Franklin Grullon, President."

The agents secured the Zerega Avenue location and radioed Agent Reid with this information. Agent Reid personally verified the information. [*7] With the assistance of Assistant United States Attorney Marjorie B. Feinzig, Agent Reid then applied for a search warrant for the Zerega Avenue location on the basis that there was probable cause to believe that contraband was concealed there. Agent Bradley accompanied Agent Reid when he was applying for the search warrant.

While Agents Reid and Bradley were in the process of applying for the search warrant, other agents went to Grullon's residence at 747 Riverside Drive to attempt to arrest him.

The search warrant for the Zerega Avenue location was obtained at 11:10 p.m. and executed immediately thereafter at 11:25 p.m. In addition to seizing the non-

drug, non-contraband evidence that is listed on the search warrant returns, ATF seized over 50 grams of cocaine from one of the car service drivers, several firearms, approximately $ 6,000 in United States currency from the Zerega Avenue location and miscellaneous drug records.

One week later, on the morning of August 11, 1994, Agent Reid assisted the NYHP, NYPD and New York City Taxi and Limousine Commission ("TLC") by making several calls to the New York One Car Service. During these telephone calls in his undercover capacity, Agent [*8] Reid ordered drugs to be delivered to specific locations. When the cars arrived, the NYHP, NYPD and TLC officers made the arrests. Later that morning, Grullon surrendered at the 43rd Precinct Station of the NYPD. Agent Reid returned to the 43rd Precinct Station and spent the remainder of August 11, 1994 processing Grullon's arrest. Neither Agent Reid, Agent Bradley nor Agent Haridopolos personally participated in a search of the New York One premises conducted by the NYHP, NYPD and TLC on August 11, 1994.

### 2. The Criminal Actions

On November 16, 1994, an 86-count indictment was unsealed charging Grullon and others with numerous acts of violence under the RICO statute for participation in a violent gang known as the Head Crackers/Willis Avenue Lynch Mob. See United States v. Grullon, 1996 U.S. Dist. LEXIS 11006, 1996 WL 437956 *1 (S.D.N.Y. Aug. 5, 1996), aff'd sub nom United States v. Torres, 129 F.3d 710 (2d Cir. 1997). On January 6, 1995, a separate one-count indictment was filed against Grullon charging him with conspiracy to sell cocaine arising out of the New York One investigation. On June 26, 1995, Agent Reid testified at a suppression hearing before this Court regarding the admissibility [*9] of evidence seized at the Zerega Avenue location.

At that hearing, Grullon argued that ATF Agents had removed evidence from the Zerega Avenue location on August 4, 1994 prior to the government obtaining the search warrant. After hearing testimony from several witnesses, Grullon's suppression motion was denied.

On August 30, 1995, Grullon pleaded guilty to conspiracy to commit robbery involving assault with a dangerous weapon, and to using the telephone to converse with a co-conspirator about the distribution of cocaine. See United States v. Grullon, 1996 WL 437956 *1. Pursuant to the August 30, 1995 plea agreement, the district court dismissed the one-count narcotics indictment arising out of the New York One investigation, as well as the remaining counts of the RICO indictment. The plea was the result of a global settlement with the government. See id. Grullon's subsequent attempts to withdraw his guilty plea were rejected by the district court and the Court of Appeals for the Second Circuit. The Second Circuit

stated that it declined to address Grullon's ineffective assistance of counsel argument given his subsequent knowing and voluntary guilty plea. See United States [*10] v. Torres, 129 F.3d at 715.

After commencing this proceeding, Grullon was transferred pursuant to a Bureau of Prisons policy that attempts to provide a maximum number of beds to deportable alien inmates in need of hearings before Immigration and Naturalization Service ("INS") judges at facilities where such hearings are available. The INS issued a final order of deportation against Grullon on August 4, 1998. Under the Bureau of Prisons policy, Grullon was moved to a "INS Release Site" to make room for an inmate who has not yet received a deportation hearing. He was transferred on September 16, 1998.

### Discussion

### I. The Court Lacks Subject Matter Jurisdiction Over Claims Brought Against The Defendants

### A. The Bivens Claims and Section 1983 Claims Are Barred by the Statute of Limitations

Congress has not designated a federal statute of limitations for Bivens actions. When there is no federal statute of limitations, a federal court should adopt a local time limitation. See Wilson v. Garcia, 471 U.S. 261, 85 L. Ed. 2d 254, 105 S. Ct. 1938 (1985). The Second Circuit has held that section 214(5) of the New York Civil [*11] Practice Law and Rules is the applicable statute of limitations for Bivens actions brought in federal court in New York State. See Chin v. Bowen, 833 F.2d 21 (2d Cir. 1987); United States ex rel. Farmer v. Kaufman, 750 F. Supp. 106, 110 (S.D.N.Y. 1990). New York Civil Practice Law and Rules section 214(5) states that an action to recover damages for personal injury must be commenced within three years. N.Y.C.P.L.R. § 214(5) (McKinney 1990). The same limitations period applies to actions commenced pursuant to 42 U.S.C. § 1983. See, Day v. Morgenthau, 909 F.2d 75, 78 (2d Cir. 1990).

Under federal law, a cause of action arises when petitioner knows or has reason to know of the alleged injury. See Leon v. Murphy, 988 F.2d 303, 309 (2d Cir. 1993); Stone v. Williams, 970 F.2d 1043, 1048 (2d Cir. 1992). The statute of limitations is not tolled for plaintiffs who are pro se or incarcerated. See, McNeil v. United States, 508 U.S. 106, 113, 124 L. Ed. 2d 21, 113 S. Ct. 1980 (1993) ("procedural rules in ordinary civil litigation should [not] be interpreted so as to excuse mistakes by those who proceed without counsel"); Edwards v. Immigration and Naturalization [*12] Serv., 59 F.3d 5, 8 (2d Cir. 1995). Grullon claims his injuries were sustained when his property was seized on either August 4, 1994 or August 11, 1994. He did not, however, file his

complaint until February 19, 1998, more than six months after the statute of limitations had passed. Therefore, all claims allegedly arising under *Bivens* and *section 1983* are time-barred and are dismissed for lack of subject matter jurisdiction. [1]

> 1   To the extent Grullon alleges claims against the Federal Defendants under *section 1983*, he must establish that the Federal Defendants were acting under color of state law. Here they were conducting an investigation into violations of federal firearms laws and narcotics laws and had obtained and executed federal search warrants. The Federal Defendants derived their authority from Federal law, *18 U.S.C. §§ 921-930, 3105, 26 U.S.C. § 7608*. It is well-settled that *section 1983* is not cognizable against federal officers acting under color of federal law. *See Pou v. U.S. Drug Enforcement Admin., 923 F. Supp. 573, 579 (S.D.N.Y. 1996), aff'd, 107 F.3d 3 (2d Cir. 1997).* Therefore, all *section 1983* claims against the Federal Defendants should be dismissed for lack of subject matter jurisdiction.
>
> To the extent Grullon alleges violations of the *Fourteenth Amendment*, those claims are not applicable to the Federal Defendants, since the *Fourteenth Amendment* is applicable only to the states and state actions. *See District of Columbia v. Carter, 409 U.S. 418, 424, 34 L. Ed. 2d 613, 93 S. Ct. 602 (1973).*
>
> To the extent Grullon seeks to sue the Federal Defendants in their official, rather than individual capacities, the claims are dismissed. Any lawsuit against an officer of the United States in his official capacity is, in essence, an action against the United States. *See Kentucky v. Graham, 473 U.S. 159, 165-66, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985).* Suits against the United States for constitutional torts "are properly dismissed for want of subject matter jurisdiction" because "such suits are ... barred from the doctrine of sovereign immunity." *Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994).*

[*13]   In responding to the Defendants' statute of limitations argument, Grullon has sought to rely upon *Rule 15, Fed. R. Civ. P.* However, the issue under *Rule 15* is not whether plaintiff was allowed to file an amended complaint, but whether the amended complaint he filed, naming entirely new parties and requesting relief not sought in the original pleading, will relate back to the date the original pleading was filed. Consideration of relation back is required because plaintiff's original pleading, consisting not of a complaint but of a *Rule 41(e)* motion for return of seized property, was filed on July 7, 1997, less than one month prior to expiration of the three-year statute of limitations. The Amended Complaint was filed on February 19, 1998, more than six months after expiration of the statute of limitations. Thus, Grullon's action against the individual defendants is time-barred unless it relates back to the July 7, 1997 date the *Rule 41(e)* motion was filed.

Pursuant to *Rule 15(c)*, an amendment of a pleading relates back when:

> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth [*14] in the original pleading, or
>
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by *Rule 4(m)* for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

*Fed. R. Civ. P. 15(c); Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 468-69 (2d Cir. 1995)* (discussing the standard for relation back of a new party by reason of mistake), *modified, 74 F.3d 1366 (2d Cir. 1996)* (per curiam); *see also Soto v. Brooklyn Correctional Facility, 80 F.3d 34, 35 (2d Cir. 1996)* (same).

It is questionable whether a civil complaint for damages may properly relate back to a motion under *Rule 41(e) of the Federal Rules of Criminal Procedure* for the return of seized property. In general, only "pleadings" as defined in *Rule 7(a)* may be amended and a motion [*15] is not a pleading. Wright, Miller & Kane, Federal Practice and Procedure: Civil 2, 1475. While Grullon captioned his complaint as "amended," in fact there is no original "complaint." *But see United States v. David, 131 F.3d 55, 61 (2d Cir. 1997)* (post-conviction *Rule 41(e)* motion is deemed a civil complaint for equitable relief).

In any case, Grullon's original *Rule 41(e)* motion named the United States as the sole defendant. His Amended Complaint, however, names various officers in their individual capacities. Because the amendment thus changes the parties, Grullon has failed to meet the three

requirements of *Rule 15(c)(3)*: 1) the claim arose out of the same conduct; 2) the new parties received notice of the action within the time period for service provided by *Rule 4(m)*, so they will not be prejudiced in defending the claims; and 3) the new parties knew or should have known that plaintiff failed to name them in the original pleading due only to a mistake concerning the identity of the proper party. *Fed. R. Civ. P. 15(c)(3)*.

Grullon has not established that the original *Rule 41(e)* motion placed the Defendants on notice that, but for a mistake, they were the intended defendants. **[*16]** [2] The *Rule 41(e)* motion sought return of property only. Grullon did not seek monetary damages or allege that his constitutional rights had been violated by the Defendants. The only party that could return the seized property to him was the government itself, not the individual defendants. Thus, the individual defendants did not know that Grullon sought to pursue any claim against them individually until he filed the Amended Complaint, more than six months after the three-year statute of limitations for *Bivens* and *section 1983* actions had passed.

> 2   It is also highly questionable whether plaintiff could satisfy the additional requirements that he show: a) that the Amended Complaint arose out of the conduct described in the *Rule 41(e)* motion, and b) that the Defendants had notice of the action within the time provided for service by *Rule 4(m)*.

This case is distinguishable from *Soto v. Brooklyn Correctional Facility*, where an inmate filed a *section 1983* action against the institution where he was incarcerated, **[*17]** seeking monetary damages for alleged constitutional violations arising out of the institution's failure to protect him from other inmates. *Soto, 80 F.3d at 35*. The Second Circuit determined that Soto had made a mistake in naming the institution because he did not claim that the alleged unconstitutional conduct was "part of any institutional custom or policy" that would have given rise to institutional liability and had instead intended to name the individual officers who had failed to protect him. *Id. at 36*. Here, Grullon's initial pleading was a petition pursuant to *Rule 41(e) of the Federal Rules of Criminal Procedure* against the government, seeking only return of seized property, relief that could not have been granted as against any individual defendant. Although Grullon listed *section 1983*, among other statutes, as a ground for jurisdiction in his original motion, he did not request monetary damages. Thus, the Federal Defendants, the City Defendants and Captain Witkowich were not on notice that "but for a mistake concerning the identity of the property party, the action would have been brought against the [Defendants personally]." *Fed. R. Civ. P. 15(c)(3)(B)*.

Grullon **[*18]** has also suggested that the statute of limitations did not begin to run until October 1998, when he received invoices from the New York City Police Department for property that was seized on August 11, 1994 by the New York City Police. Indeed, by filing the Amended Complaint on February 19, 1998, Grullon himself demonstrated that any claims against the Defendants arose substantially before October 1998. Accordingly, the Amended Complaint should be dismissed for lack of jurisdiction because the claims against the Defendants are barred by the statute of limitations.

## B. Collateral Estoppel Bars a Challenge to the Validity of the August 4, 1994 Search

Even if Grullon's claims were considered to be timely, many of them are barred by the doctrine of collateral estoppel. The doctrine of collateral estoppel bars relitigation of issues that have been fully litigated in another forum. For collateral estoppel to apply, the court must find that (1) the issues in both proceedings were identical, (2) the issue in the prior proceeding as to which estoppel is sought was actually litigated and decided, (3) there was a full and fair opportunity for litigation of that issue in the prior proceeding, **[*19]** and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits. *See Montana v. United States, 440 U.S. 147, 153, 59 L. Ed. 2d 210, 99 S. Ct. 970 (1979); Allen v. McCurry, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980); Gelb v. Royal Globe In. Co., 798 F.2d 38, 44 (2d Cir. 1986); Lavin v. Thornton, 959 F. Supp. 181, 185 (S.D.N.Y. 1997)*.

In this action, Grullon has alleged that agents seized evidence from the Zerega Avenue location in the afternoon of August 4, 1994 prior to issuance of the search warrant. Grullon previously litigated the legality of the August 4, 1994 search and seizures at the Zerega Avenue location through a suppression motion in the criminal action, challenging the government's probable cause to obtain the warrant and alleging that agents seized evidence in the afternoon of August 4, 1994 prior to issuance of the search warrant at 11:10 p.m. Grullon's motion to suppress the evidence was denied, the Court finding that the government did not seize any evidence prior to obtaining the search warrant and had probable cause to obtain the warrant. Thus, the issues as to the August 4, 1994 search and seizures **[*20]** raised in the suppression hearing are identical to those raised in this proceeding, they were litigated in a forum which provided Grullon with a full and fair opportunity for litigation, and they were necessary to support a final judgment on the merits. Accordingly, the doctrine of collateral estoppel applies to bar relitigation of the validity of the August 4, 1994 search and seizure in this action. *See, e.g., McCarthy v. United States, 394 U.S. 459, 466, 22 L. Ed. 2d 418, 89 S. Ct. 1166 (1969); Hayle v. United States, 815 F.2d 879,*

*881 (2d Cir. 1987); United States v. Podell, 572 F.2d 31, 35 (2d Cir. 1978); Berman v. Turecki, 885 F. Supp. 528, 533 (S.D.N.Y. 1995).*

Grullon cannot avoid the estoppel effect of the suppression hearing by alleging that the criminal action arising out of the New York One investigation was not fully litigated since his guilty plea was a global resolution of both criminal actions. One criminal case charged multiple racketeering counts of robbery and murder, while the second criminal case charged a single narcotics trafficking count arising out of delivery of the drugs via plaintiff's car service. *129 F.3d at 713.* The superseding indictment [*21] to which Grullon pleaded guilty contained one racketeering count and one narcotics count, thus incorporating the elements of the two separate criminal actions. *Id. at 713-14. See also United States v. Grullon, 1996 WL 437956 at *1* (guilty plea would be in satisfaction of the charges pending against him in both cases).

By pleading guilty to the federal robbery and telephone narcotics trafficking communication charges, Grullon not only admitted his guilt but also conceded the lawfulness of his arrest and the search of his business. *See Berman, 885 F. Supp. at 533* ("guilty plea is not just an admission of unlawful conduct, it is a waiver of all the constitutional rights embodied in the right to a jury trial"); *United States v. Arango, 966 F.2d 64, 66 (2d Cir. 1992)* (guilty plea determined issue of lawfulness of search); *Reese v. York, 571 F. Supp. 1046, 1048 (N.D. Tex. 1983)* (guilty plea "disposes of any issue pertaining to the constitutionality of Plaintiff's arrest, interrogation, search and prosecution"). Accordingly, since Grullon chose to plead guilty, he cannot now challenge the adequacy of the August 4, 1994 search warrant or search and all claims against the [*22] Defendants arising out of the August 4, 1994 search should be dismissed.

Grullon directly challenges the outcome of the June 26, 1995 suppression hearing by once again attacking the effectiveness of his counsel and the voluntariness of his plea. These issues have been fully litigated in numerous motions in the criminal cases and Grullon has exhausted his appeals of those motions. *See Torres, 129 F.3d at 715-16* (denial of Grullon's motions to withdraw his guilty plea affirmed). [3]

---

[3]  Indeed, the Second Circuit, in rejecting plaintiff's first motion to withdraw his guilty plea, specifically declined to address his "argument that his counsel was constitutionally ineffective by failing to interview and call certain witnesses at a pretrial suppression hearing," based on the general rule that defenses are waived by a guilty plea. *Torres, 129 F.3d at 715.*

Finally, Grullon claims that Defendants did not provide him with documentation which would have allowed him to establish a defense, must be dismissed. As [*23] a preliminary matter, it is unclear what Grullon is claiming here. However, to the extent that he is claiming that a conspiracy subverted his defense, which thereby lead to his guilty plea, he appears to challenge his incarceration. Grullon may not make a claim in a § 1983 setting that would have the effect of undermining the basis for his incarceration (plea or conviction). *See Heck v. Humphrey, 512 U.S. 477, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994).*

## C. The Amended Complaint Fails to Allege the Personal Participation of the Federal Defendants

All claims against the Federal Defendants arising out of the August 11, 1994 search must be dismissed because Grullon has failed to meet the burden of establishing in a *Bivens* action, as to each defendant, specific facts that show the defendants' personal participation in the alleged constitutional violation. *See Mitchell v. Forsyth, 472 U.S. 511, 526, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985); Lee v. Carlson, 645 F. Supp. 1430, 1436 (S.D.N.Y. 1986)* (Second Circuit requires "direct and personal responsibility" on the part of *Bivens* defendants), *aff'd, 812 F.2d 712 (2d Cir. 1987).* Absent such specific [*24] allegations, the amended complaint is insufficient as a matter of law and must be dismissed. *See Barbera v. Smith, 836 F.2d 96, 99 (2d Cir. 1987)* (dismissing *Bivens* complaint in part because it did "not allege any personal involvement" by defendant).

Grullon has alleged only that Agents Reid and Bradley "were . . . participants" in an August 11, 1994 "raid" on his place of business in which unnamed defendants seized property from the premises without a warrant. He has not alleged that Reid or Bradley personally searched the business or seized any property on August 11, 1994. These conclusory allegations, without more specific instances of alleged misconduct, are insufficient to withstand a motion for summary judgment. [4]

---

[4]  In fact, neither Agent Reid nor Agent Bradley nor Agent Haridopolos conducted any search of the New York One premises on August 11, 1998.

Grullon further alleges that the Federal Defendants conspired together "and intentionally neglected to produce any documentation to Grullon in [*25] connection with the events that occurred when they conducted a search [of the Zerega Avenue location] on August 4 at approximately 3:30 p.m.; and August 11 at approximately 10:00 a.m." These vague and conclusory allegations of conspiracy are insufficient to withstand a motion for summary judgment. *See Leon, 988 F.2d at 310; Lewal v. Doe, 1994 U.S. Dist. LEXIS 7826, 1994 WL*

*263 521* at *3 (S.D.N.Y. 1994). Grullon's claims that the Federal Defendants refused to turn over the seized property are also too vague to support a *Bivens* action. Moreover, virtually all of the property has now been returned, within a reasonable time after Grullon's criminal appeals were resolved on November 17, 1997. *United States v. David, 131 F.3d 55, 58 (2d Cir. 1997)* (post-seizure delay in returning property did not violate due process). Grullon has not articulated any way in which the named defendants personally participated in the alleged delay or how the delay in returning his property prejudiced him.

### D. *The Federal Defendants are Entitled To Qualified Immunity*

The Supreme Court has recognized a limited waiver of immunity for claims of constitutional violations brought against federal employees in their [*26] individual, rather than official, capacities. *See Bivens, 403 U.S. at 389. Bivens* allows suits from damages against a federal official only if the official personally violated a well-established constitutional right of which a reasonable person would have known. *See Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982); Butz v. Economou, 438 U.S. 478, 507, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978).*

Even where they have violated a constitutional right, government officials are protected from suits against them in their individual capacity for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow, 457 U.S. at 818.* A right is "clearly established" if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987); Hunter v. Bryant, 502 U.S. 224, 229, 116 L. Ed. 2d 589, 112 S. Ct. 534 (1991); Siegert v. Gilley, 500 U.S. 226, 232, 114 L. Ed. 2d 277, 111 S. Ct. [*27] 1789 (1991).* Where a right is established, "the defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *In re State Police Litig., 88 F.3d 111, 123 (2d Cir. 1996).* The question to be answered is whether the "defendant *acted* reasonably under settled law in the circumstances, not whether another reasonable or more reasonable, interpretation of the events can be construed . . . after the fact." *Hunter, 502 U.S. at 229.*

The qualified immunity defense is "an immunity from suit rather than a mere defense from liability." *Mitchell, 472 U.S. at 526.* In recognition of this, the Supreme Court has repeatedly stressed the desirability of resolving the qualified immunity issues at the earliest

stage of litigation. *See Hunter, 502 U.S. at 227; Mitchell, 472 U.S. at 526.* Once the individual defendants raise qualified immunity, a plaintiff cannot maintain a *Bivens* action against them unless he can prove that each defendant violated a clearly established constitutional right. *See Siegert, 500 U.S. at 232.* In this case, Grullon [*28] cannot establish that the Defendants have violated a constitutional right, much less a clearly established one.

The Defendants were acting reasonably on August 4, 1994 when they were executing duly issued federal search warrants and arrest warrants as part of an investigation into armed narcotics trafficking. *See Pou, 923 F. Supp. at 580.* It was well within their rights to visit various locations to try to find individuals for whom arrest warrants had been issued. Further, the Federal Defendants did not violate Grullon's constitutional rights by securing the Zerega Avenue location until they could obtain a search warrant. [5] Accordingly, they are entitled to qualified immunity for all actions arising out of their execution of the search and arrest warrants. [6]

5   Moreover, Grullon does not have standing to object to the alleged warrantless search of his sister's apartment. *See United States v. Modica, 663 F.2d 1173, 1177 (2d Cir. 1981)* (finding plaintiff lacked standing to object to the search of a bag that he conceded was not his).

6   Although the complaint primarily alleges constitutional violations based on the government's failure to return and/or delay in returning his personal property, it appears that Grullon also seeks to overturn his conviction by challenging the constitutionality of the underlying search based on violations of the *Fourth, Fifth* and *Fourteenth Amendments.* As the Supreme Court held in *Heck, 512 U.S. 477, 129 L. Ed. 2d 383, 114 S. Ct. 2364,* a *section 1983* plaintiff must show that his underlying conviction was terminated in his favor in order to succeed on a constitutional tort claim. As the Second Circuit has held, a "claim for damages based on a conviction or sentence that has not been invalidated as described [in *Heck*] is not cognizable under [*Bivens*]". *Tavarez v. Reno, 54 F.3d 109, 110 (2d Cir. 1995).* Grullon cannot show that his conviction has been overturned, since he has exhausted his appeals without success. *See United States v. Torres, 129 F.3d at 715).* Therefore, his *Bivens* claims, to the extent they challenge his underlying conviction, must be dismissed under *Heck.*

[*29] The amended complaint and the record is devoid of any other allegations of specific actions on the part of the Defendants. [7] Thus, Grullon has alleged no

action on the part of the Defendants that would make them ineligible for qualified immunity. On the contrary, all of the Federal Defendants' actions described in the amended complaint were reasonable for federal law enforcement agents investigating criminal activity. Accordingly, the Federal Defendants are entitled to qualified immunity dismissing al of Grullon's claims.

7   Grullon does allege that Agent Reid made false statements at a suppression hearing. However, Agent Reid is absolutely immune from liability for his testimony in court. *Briscoe v. Lahue, 460 U.S. 325, 75 L. Ed. 2d 96, 103 S. Ct. 1108 (1983); See Daloia v. Rose, 849 F.2d 74 (2d Cir. 1988)* (immunity extends to testimony at pretrial hearing).

**E. The Failure to Return Property Claim is Dismissed**

Grullon appears to allege that certain property seized during the course of the [*30] August 4 and 11, 1994 searches is being improperly withheld from him, although the facts set forth above establish otherwise. City Defendants make two observations with respect to this issue. First, it is not entirely clear as to which defendant (Federal, City, or Housing Authority), that this claim (or for that matter, the "property" which Grullon alludes to in asserting this claim) is directed.

But more importantly, even assuming that Grullon is directing this allegation of improperly seized property to City Defendants, he has an adequate post-deprivation remedy in state court, and thus has no due process claim. *See Parratt v. Taylor, 451 U.S. 527, 543-44, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981), reversed on other grounds, Daniels v. Williams, 474 U.S. 327, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986); Davidson v. Cannon, 474 U.S. 344, 88 L. Ed. 2d 677, 106 S. Ct. 668 (1986).* In *Parratt*, the Court recognized that post-deprivation remedies made available by the state can satisfy the Due Process Clause. *451 U.S. at 538.*

Once all criminal proceedings involving confiscated property have terminated and a demand for the property has been made, a property clerk must turn [*31] over to a claimant any such property that is not "per se contraband." *Lipscomb v. Property Clerk, 188 A.D.2d 993, 592 N.Y.S.2d 96 (3d Dep't 1992) (quoting United States v. Farrell, 196 U.S. App. D.C. 434, 606 F.2d 1341, 1344 (D.C. Cir. 1979)).* Because an individual seeking to retrieve his property has recourse to state court remedies, there is no due process violation, and therefore no viable § 1983 claim. This claim, therefore, is dismissed as well.

**II. Grullon is not Entitled to a Preliminary Injunction**

Grullon has alleged that his transfer from Allenwood to another facility within the Bureau of Prisons was "made solely for purpose of relation [sic] for his exercise of a constitutional right . . . access to the courts." Motion at P 6, (*citing Meriwether v. Coughlin, 879 F.2d 1037, 1045-48 (2d Cir. 1989)*). He further states that he wants to be detained at Allenwood "where he has available legal assistance with fellow inmates whom are familiar with his case."

A court may issue a preliminary injunction to preserve the status quo and prevent irreparable harm to the movant until an underlying motion for injunctive relief may be resolved. *See, e.g., Warner* [*32] *Bros. Inc. v. Dae Rim Trading, Inc., 877 F.2d 1120, 1124-25 (2d Cir. 1989); Fed. R. Civ. P. 65.* Such relief, however, may only be granted where the movant establishes (a) irreparable harm absent an injunction, and (b) either (1) a likelihood of success on the merits of his claims or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the moving party." *Jackson v. Johnson, 962 F. Supp. 391, 392 (S.D.N.Y. 1997)* (prisoner not entitled to a preliminary injunction assigning him to specific prison); *see also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979).* Here, Grullon has shown no likelihood of success on the merits of his claim.

Grullon has made no showing whatsoever that he will be denied adequate access to legal materials in his new prison. It is well settled that a prisoner has no constitutional right to serve a sentence in any particular institution, or to be transferred or not transferred from one facility to another. *See Olim v. Wakinekona, 461 U.S. 238, 249-50, 75 L. Ed. 2d 813, 103 S. Ct. 1741 (1983), Meachum v. Fano, 427 U.S. 215,* [*33] *224-25, 49 L. Ed. 2d 451, 96 S. Ct. 2532 (1976); Prins v. Coughlin, 76 F.3d 504, 507 (2d Cir. 1997).* The Bureau of Prisons has "sole discretion" to determine where a federal inmate will be housed. *United States v. Williams, 65 F.3d 301, 307 (2d Cir. 1995), (citing 18 U.S.C. § 3621).* Only in the rare instance where a transfer is made solely in retaliation for the exercise of a constitutional right will the transfer violate a prisoner's constitutional rights. *See Meriweather v. Coughlin, 879 F.2d at 1045-46.*

**III. The Motion to Amend the Complaint is Denied as Futile**

*Rule 15(a) of the Federal Rules of Civil Procedure* provides in pertinent part that:

A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive

pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

*Fed. R. [\*34] Civ. P. 15(a).* Leave to amend a complaint should be freely granted when justice so requires, but is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile. *See Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962); Jones v. New York State Div. of Military and Naval Affairs, 166 F.3d 45, 50 (2d Cir. 1999); Hunt v. Alliance North American Government Income Trust, Inc., 159 F.3d 723, 728 (2d Cir. 1998).*

The amendment of a complaint is futile where, as here, the statute of limitations has run on the plaintiff's claims. *See Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1198 (2d Cir. 1989); Corcoran v. Sinclair, 1999 U.S. Dist. LEXIS 3732, No. 97 Civ. 9286, 1999 WL 177444 (S.D.N.Y. March 30, 1999); Sealey v. Fishkin, 1998 U.S. Dist. LEXIS 20142, No. 97 Civ. 6303, 1998 WL 1021470 (E.D.N.Y. Dec. 2, 1998).* In *Corcoran,* the three year statute of limitations for actions brought pursuant to *section 1983* had expired. *1999 WL 177444 at \*10.* Because any additional claims filed by the plaintiff's estate against the individual defendants would have been barred by the statute of limitations, leave to amend was denied as futile. *Id. at \*13.*

In an attempt [\*35] to avoid the jurisdictional bar of the statute of limitations, the plaintiff in *Corcoran* argued that the claims related back to an earlier complaint filed against corporate defendants and should therefore be considered timely. *Id. at \*10.* Because the amended complaint added new parties, relation back was not permitted under *rule 15(c) of the Federal Rules of Civil Procedure. Id.*

The proposed *second amendment* of the complaint in this action is similarly futile because Grullon's claims against the individual Defendants are barred by the statute of limitations. As set forth above, Grullon's claims are subject to the same three-year statute of limitations applied in *Corcoran. Chin v. Bowen, 833 F.2d at 24.*

Accordingly, the amended complaint does not relate back to the motion for return of seized property and the claims against the individual defendants are barred by the statute of limitations.

### Conclusion

For the reasons set forth above, the Defendants' motion to dismiss the complaint is granted and Grullon's motions for preliminary injunction and to file an amended complaint are denied.

Settle judgment on notice.

It is so ordered.

New York, [\*36] N. Y.

June 21, 1999

ROBERT W. SWEET

U.S.D.J.

LEXSEE 2004 U.S. DIST. LEXIS 23365

**NICASIO HERNANDEZ, Plaintiff, - v - THE CITY OF NEW YORK, et al., Defendants.**

**00 Civ. 9507 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 23365*

**November 18, 2004, Decided**
**November 22, 2004, Filed**

**DISPOSITION:** Defendants' motion for summary judgment dismissing plaintiff's complaint was granted.

**COUNSEL:** [*1] STEPHEN SANTUCCI, ESQ., Attorney for Plaintiff, Staten Island, NY.

HONORABLE MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, Attorneys for Defendants, New York, NY, By: RACHEL A. SELIGMAN, Assistant Corporation Counsel, Of Counsel.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

**Sweet, D.J.,**

The City of New York (the "City"), Police Officer Raul Rosario ("Rosario") and Police Officer Paul D. Fernandez ("Fernandez") (collectively the "Defendants") have moved pursuant to *Rule 56, Fed. R. Civ. P.,* for summary judgment dismissing the complaint of plaintiff Nicasio Hernandez ("Hernandez"), who proceeded *pro se* prior to November 4, 2002. For the reasons set forth below, the motion is granted.

*Prior Proceedings*

On December 14, 2000, Hernandez filed his complaint *pro se* alleging: (1) federal civil rights violations pursuant to *42 U.S.C. §§ 1983, 1985* and *1986* (Compl. P 31); (2) state law claims of assault, battery, abuse of process, unlawful arrest, and intentional infliction of emotional distress (Compl. P 35); and (3) state civil rights violations. (*Id.*[[). [*2] The issue was joined, []discovery had, and the instant motion, including *Local*

*Rule 56.2* Notice to Pro Se Litigants Opposing a Motion for Summary Judgment, was marked fully submitted on May 19, 2004. Hernandez, proceeding *pro se*, filed no opposition to this motion. On November 4, 2004, a notice of appearance by attorney Stephen Santucci on behalf of Hernandez was entered.

**The Facts**

The following facts are drawn from the Defendants' unopposed *Local Rule 56.1* statement, plaintiff's deposition testimony and the other documents in the record:

1. Plaintiff stated that on January 13, 2000, he boarded a Lexington Avenue Local subway train (a "6 train") at the Spring Street station in Manhattan. [1] (November 12, 2003 Deposition of Nicasio Hernandez, Seligman Decl. Ex. B ("Hernandez Dep") at 30.)

> [1] During his November 12, 2003 deposition, Hernandez initially testified that he boarded an Eighth Avenue Local train (a "C train") at Spring Street in Manhattan. (Hernandez Dep. at 27). However, Hernandez' subsequent deposition testimony clarified that he boarded a 6 train at Spring Street. It should be noted that there are at least two MTA New York City Subway stations on Spring Street. The C train stops at the station at Spring Street and 6th Avenue, and the 6 train stops at the station at Spring Street and Lafayette Street.

[*3] 2. Plaintiff stated that while the train was traveling between 125th Street and 138th Street, he switched subway cars so that he would be closer to the steps when he reached his final destination. (*Id.* at 27, 32.)

3. Plaintiff stated that he switched from one subway car to another while the train was moving. (*Id.* at 30).

4. Plaintiff stated that prior to exiting the moving car, he read and understood a sign stating that passengers are not permitted to move between cars while the train is in motion. (*Id.* at 47-48.)

5. Plaintiff stated that he understood the sign even though it was not written in Spanish. (*Id.* at 47.)

6. Plaintiff stated that prior to January 13, 2000, he had changed subway cars while the train was moving on many occasions. (*Id.* at 46.)

7. Plaintiff stated that on January 13, 2000, Rosario and Fernandez observed him changing subway cars while the train was moving. (*Id.* at 33; *see also* January 13, 2000 Transit Adjudication Bureau Summons, Seligman Aff. Ex. A.)

8. Plaintiff stated that upon seeing him change cars, Rosario and Fernandez approached him. (Hernandez Dep. at p.33.)

9. Plaintiff stated that when Rosario and Fernandez approached, **[*4]** he was holding onto a pole in the subway car and that he would not let go of this pole. (*Id.* at 31, 34.)

10. Plaintiff stated that during the time that he was holding the pole, Rosario and Fernandez grabbed him and then hit him with closed fists twice on each shoulder. (*Id.* at 40.)

11. Plaintiff stated that when the train reached the Cypress Avenue Station, Rosario and Fernandez forcibly removed him from the car. (*Id.* at 33-35.)

12. Plaintiff stated that on a platform of the Cypress Avenue station, Rosario and Fernandez pushed him face-first against a wall and put their guns to his head and back. (*Id.* at 35)

13. Plaintiff stated that while Rosario and Fernandez had their guns against him, they patted him down and checked his pockets. (*Id.* at 38.)

14. Plaintiff stated that Rosario and Fernandez subsequently issued him a summons for Unsafe Riding. (*Id.* at 35,45; *see also* Seligman Aff. Ex. A.)

15. Plaintiff stated that after receiving the summons, he waited alone on the platform at the station for another 6 train to arrive. (Hernandez Dep. at 48-49.)

16. Plaintiff stated that approximately twenty minutes later, he boarded another 6 train. (*Id.* at **[*5]** 48.)

17. Plaintiff indicated that he was detained at the Cypress Avenue Station for a total of 3-5 hours on January 13, 2000. (*Id.* at 48.)

18. Plaintiff stated that he was not placed in handcuffs at any time on January 13, 2000. (*Id.* at 49.)

19. Plaintiff stated that he did not request medical attention on January 13, 2000. (*Id.*)

20. Plaintiff stated that on January 13, 2000, he did not at any time indicate to Rosario or Fernandez that he was hurt or injured. (*Id.* at 49-50.)

21. Plaintiff stated that at some time after January 13, 2000, he developed pain in his shoulders. (*Id.* at 50.)

22. Plaintiff stated that he did not recall when he first sought medical treatment for the alleged injuries he suffered as a result of the January 13, 2000 incident or the name of the doctor that he saw. (*Id.*)

23. Plaintiff stated that he subsequently paid the summons that he was issued on January 13, 2000. (*Id.* at 54-55; *see also* Seligman Aff. Ex. C.)

## Discussion

### 1. *Legal Standard*

Under *Rule 56(c), Fed. R. Civ. P.*, summary judgment is warranted when, in viewing the evidence in the light most **[*6]** favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Anderson v. Liberty Lobby, 477 U.S. 242, 251, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

A motion for summary judgment requires the party with the burden of proof at trial to "make a showing sufficient to establish the existence of an element essential to that party's case . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Where the "record taken as a whole could not lead a rational trier of fact to find for the moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (quoting *First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)*). Accordingly, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, **[*7]** and admissions on file, together with affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled to judgment as a matter of law." *R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997)* (quoting *Fed. R. Civ. P. 56(c)*).

### 2. Federal Constitutional Violations

#### A. *Alleged Violations*

Hernandez has alleged that he was seized, searched, arrested, and subjected to excessive force in violation of the *Fourth Amendment* as applied to the states by the

*Fourteenth Amendment. See Mapp v. Ohio, 367 U.S. 643, 655, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 86 Ohio Law Abs. 513 (1961).* Based on these alleged constitutional violations, Hernandez has asserted claims for monetary damages pursuant to *42 U.S.C. §§ 1983, 1985 and 1986.*

### i. 42 U.S.C. § 1983

Hernandez has asserted claims pursuant to *§ 1983,* which imposes liability for acts taken under color of state law which deprive a plaintiff of "rights, privileges, or immunities secured by the Constitution and laws." *42 U.S.C. § 1983.* The Supreme Court [*8] has interpreted this statute as imposing liability "only for conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and its laws." *Rizzo v. Goode, 423 U.S. 362, 370, 46 L. Ed. 2d 561, 96 S. Ct. 598 (1976)* (citation omitted). Thus, in order to prevail on a *section 1983* claim, the plaintiff must prove that the defendant: (1) acted, (2) under color of state law, (3) in a manner which deprived the plaintiff's constitutional rights. *See, e.g., Candelaria v. Coughlin, 787 F. Supp. 368, 372 (S.D.N.Y. 1992), aff'd, 979 F.2d 845 (2d Cir. 1992).*

### ii. 42 U.S.C. § 1985

Hernandez alleges that the Defendants conspired to violate his civil rights. As such, he has alleged violations of *42 U.S.C. § 1985(3),* which provides a cause of action where:

> two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... if one or more persons ... do, or [*9] cause to be done, any act in furtherance of the object of such conspiracy, whereby another is ... deprived of having and exercising any right or privilege of a citizen of the United States....

*42 U.S.C. § 1985(3).*

To state a claim for conspiracy to violate an individual's constitutional rights, a plaintiff must show: (1) a conspiracy (2) for the purpose of depriving of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. *Smith v. Metro North Commuter R.R., 2000 U.S. Dist. LEXIS 14168, No. 98 Civ. 2528 (RWS), 2000 WL 1449865, at *6 (S.D.N.Y.*

*Sept. 29, 2000)* (citing *Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999)).*

### iii. 42 U.S.C. § 1986

Hernandez has also asserted a claim pursuant to *§ 1986,* which "provides a cause of action against anyone who 'having knowledge that any of the wrongs conspired to be done and mentioned in *section 1985* are about to be committed and having power to [*10] prevent or aid, neglects to do so.'" *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1088 (2d Cir. 1993)* (quoting *Katz v. Morgenthau, 709 F. Supp. 1219, 1236 (S.D.N.Y. 1989), aff'd in part and rev'd in part on other grounds, 892 F.2d 20 (2d Cir. 1989)).* Thus, a *§ 1986* claim can only proceed if there is a valid *§ 1985* claim. *See id.* (citing *Dacey v. Dorsey, 568 F.2d 275, 277 (2d Cir. 1978)).*

### B. The City Is Not Liable

Hernandez' *§ 1983* claims against the City are dismissed.

### i. No § 1983 Liability

In order to hold the City liable as a "person" within the meaning of *42 U.S.C. § 1983,* Hernandez must establish that the City was at fault for the injury he suffered, *see Oklahoma City v. Tuttle, 471 U.S. 808, 810, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985); Monell v. Dep't of Social Servs., 436 U.S. 658, 690-91, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978),* in that the violation of his constitutional rights resulted from a municipal policy, custom or practice. *See Monell, 436 U.S. at 694; Vann v. New York, 72 F.3d 1040, 1049 (2d Cir. 1995).* [*11] A plaintiff may satisfy the "policy, custom or practice" requirement in one of four ways. *See Moray v. City of Yonkers, 924 F. Supp. 8, 12 (S.D.N.Y. 1996).* The plaintiff may allege the existence of (1) a formal policy officially endorsed by the municipality, *see Monell, 436 U.S. at 690;* (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question, *see Pembaur v. Cincinnati, 475 U.S. 469, 483-84, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986)* (plurality opinion); *Walker v. New York, 974 F.2d 293, 296 (2d Cir. 1992);* (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials, *see Monell, 436 U.S. at 690-91;* or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *See Canton v. Harris, 489 U.S. 378, 388, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989).* There must also be a causal link between the [*12] policy, custom or practice and the alleged injury in order to find liability against a municipality. *See Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983).* "[A] single inci-

dent alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998)* (quoting *Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991))*. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby, make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur, 475 U.S. at 479* (emphasis in original).

Hernandez has demonstrated no basis for the imposition of *Monell* liability. First, he has offered no evidence to show that the alleged civil rights violations were committed pursuant to a formal policy endorsed by the City. Second, he has offered no evidence to show that City policymakers took any action that caused the alleged rights violations to occur. Third, **[*13]** he has offered no evidence to show that the alleged rights violations were committed pursuant to a consistent and widespread practice. Fourth, he has offered no evidence to show that City policymakers, through a failure of adequate training or supervision, were deliberately indifferent to rights violations committed by police officers like Fernandez and Rosario. Therefore, any *§ 1983* claims asserted against the City are dismissed in their entirety.

### ii. No § 1985 Liability

To hold the City liable pursuant to *§ 1985(3)*, Hernandez must show that the alleged constitutional violations that he suffered were the result of a City policy, custom, or practice. *Owens v. Haas, 601 F.2d 1242, 1247 (2d Cir. 1979)*. Since plaintiff has failed to present any evidence that the alleged violations that he suffered were the result of a municipal policy, custom, or practice, his *§ 1985(3)* claim against the City is dismissed.

### iii. No § 1986 Liability

"[A]*§ 1986* claim must be predicated upon a valid *§ 1985* claim." *Mian, 7 F.3d at 1088*. Since Hernandez has failed to satisfy his burden of production with respect to the *§ 1985* claim **[*14]** against the City, his *§ 1986* claim against the City must also be dismissed.

### C. The § 1983 Claims Against Rosario and Fernandez are Dismissed

### i. The False Arrest and Unlawful Seizure Claims Are Dismissed

Hernandez has asserted a *§ 1983* claims against Fernandez and Rosario on the theory that his arrest and attendant detention at the Cypress Avenue Station violated the *Fourth Amendment*. The Second Circuit has held that the elements of a *§ 1983* false arrest claim are substantially similar to the elements of a false arrest claim under

New York law. *Weyant v. Okst[[, 101 F.3d 845, 852 (2d ]]Cir. 1996)*. "Under New York law, a plaintiff claiming false arrest must show, *inter alia*, that the defendant intentionally confined him without his consent and without justification." *Id.* In an action for false arrest, whether brought under *§ 1983* or New York state law, "the existence of probable cause . . . constitutes justification and 'is a complete defense to [the] action . . . .'" *Id.* (quoting *Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994))*.

### a. Hernandez' Payment of the Transit Fine Does Not **[*15]** Bar his § 1983 Action *Against Fernandez and Rosario*

The Second Circuit has stated that a conviction is conclusive evidence that a given arrest was made with probable cause unless the conviction is reversed on appeal. [2] *Id.* Since a guilty plea is the equivalent of a conviction, *Saddler v. United States, 531 F.2d 83, 85-86 (2d Cir. 1976)*, a guilty plea will also bar a *§ 1983* false arrest claim. *See, e.g., Osuch v. Gregory, 303 F. Supp. 2d 189, 195 (D. Conn. 2004); Almonte v. Florio, 2004 U.S. Dist. LEXIS 335, No. 02 Civ. 6722 (SAS), 2004 WL 60306 at *5 (S.D.N.Y. Jan. 13, 2004); Papeskov v. Brown, 1998 U.S. Dist. LEXIS 8355, No. 97 Civ. 5351 (SS), 1998 WL 299892 at *5 (S.D.N.Y. June 8, 1998)*.

    2   The Supreme Court has held that to recover damages for false arrest, a *§ 1983* plaintiff must prove that the conviction had been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determinations, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck v. Humphrey, 512 U.S. 477, 487, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994)*.

**[*16]** The Defendants argue that Hernandez' payment of a $ 75 fine to the New York City Transit Adjudication Bureau, Seligman Dec. Ex. C, is equivalent to a guilty plea, and that such payment therefore bars his *§ 1983* false arrest claim. This argument is undercut by the text of *§ 1050.10 of the New York City Transit Rules of Conduct* (the "Rules of Conduct"), which states that fines imposed by the Transit Adjudication Bureau are civil penalties, and that the imposition of such penalties is an alternative to criminal prosecution. [3] Defendants have failed to cite any authority for the proposition that payment of a civil penalty is equivalent to a guilty plea in a criminal prosecution. Moreover, the opinion of the *Sadler* court militates against any such proposition. In *Sadler*, the Second Circuit stated:

    Before accepting a guilty plea the district court must of course satisfy itself that the defendant is offering the plea volun-

tarily and that he is competent to understand the nature of the charge, his constitutional rights, and the scope of the penalty provided by law. [Citations omitted]. Since a guilty plea is the equivalent of a conviction and involves the defendant's **[*17]** waiver of precious constitutional rights, [citation omitted], the district courts have been instructed to exercise the "utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." [Citation omitted].

*Saddler, 531 F.2d at 85-86.* The Defendants have failed to demonstrate that the payment of the fine was attended by equivalent solemnities insuring that Hernandez was aware of the rights and protections that he was allegedly waiving. Based on the foregoing, Hernandez' payment of a civil penalty to the Adjudication Bureau will not be deemed equivalent to a guilty plea and will not bar his *§ 1983* false arrest claim.

3  *§ 1050.10* provides, in pertinent part, that:

> any person committing one or more violations of [the New York City Transit Rules of Conduct] shall be subject to *either:)*

> (a) *criminal prosecution* in the criminal court of the City of New York, which court may impose a fine not to exceed $ 25 or a term of imprisonment for not longer than 10 days, or both; *or*

> (b) *civil penalties* imposed by the transit adjudication bureau in an amount not to exceed $ 100 per violation (exclusive of interest or costs assessed thereon).

*21 NYCRR § 1050.10* (emphasis added).

**[*18]  b. The Record Establishes that Rosario and Fernandez had Probable Cause to *Arrest Hernandez***

Hernandez' deposition testimony demonstrates that Rosario and Fernandez had probable cause to arrest Hernandez for passing between subway cars while the train was in motion. [4] A defendant police officer who arrests a person without a warrant, as in this case, is not liable for false arrest if the officer had reasonable cause to believe that the individual committed an offense. *See Illinois v. Gates, 462 U.S. 213, 241-46, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983); United States v. Ceballos, 812 F.2d 42, 50 (2d Cir. 1987).* The existence of probable cause must be determined on the basis of the totality of the circumstances. *Gates, 462 U.S. at 230-32.* Probable cause exists "when the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995)* (quoting *O'Neill v. Town of Babylon, 986 F.2d 646, 650 (2d Cir. 1993)).* **[*19]**

4  *§ 1050.9(d) of the Rules of Conduct* provides, in pertinent part, that no person may ride on the "platform between subway cars or any other area outside any subway car . . . ." *21 NYCRR § 1050.9(d).*

Hernandez has admitted (1) that he passed between subway cars while the train was in motion on the night in question, and (2) that Rosario and Fernandez observed him while he engaged in this conduct. *See Hernandez Dep. at 30-33.* These admissions provide uncontested proof that Rosario and Fernandez had probable cause to arrest him. Therefore, Hernandez' false arrest claim is dismissed.

**c. Hernandez Has Failed to Show that the Detention in the Cypress Avenue Station *Was Unreasonable***

Hernandez has also alleged a *§ 1983* violation based on the theory that he was detained at the Cypress Avenue Station in violation of the *Fourth Amendment.* As discussed above, this detention, which apparently lasted 3-5 hours (Hernandez Dep. at 48), attended an arrest that was based on probable cause. Based on **[*20]** these facts, the alleged detention is analogous to the detention of an arrestee pending the commencement of a probable cause hearing. Under such circumstances, a criminal defendant can generally be held for up to 48 hours without implicating the *Fourth Amendment. County of Riverside v. McLaughlin, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 111 S. Ct. 1661 (1991).* For detentions of less than 48 hours, the *§ 1983* plaintiff has the burden of showing that the detention was unreasonable. *Id. at 57.* Since Hernandez has failed to make any such showing of unreasonableness, his unlawful seizure claim must be dismissed.

**ii. *The Excessive Force Claim Is Dismissed***

Hernandez also claims, pursuant to *§ 1983,* that Rosario and Fernandez used excessive force against him in violation of the *Fourth Amendment.* The Second Circuit has stated that a "police officers' application of force is excessive, in violation of the *Fourth Amendment,* if it

is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Maxwell v. New York, 380 F.3d 106, 108 (2d Cir. 2004)* (quoting *Graham v. Connor, 490 U.S. 386, 397, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989).* [*21] The Second Circuit has stated:

> Not every push or shove by a state officer constitutes a violation of substantive due process. Whether the constitutional line has been crossed depends on "such factors as [1] the need for the application of force, [2] the relationship between the need and the amount of force that was used, [3] the extent of injury inflicted, and [4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Robison v. Via, 821 F.2d 913, 923 (2d Cir. 1987)* (quoting *Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).*

These factors are evaluated from the perspective of a reasonably objective officer in the circumstances at the time of the incident and it is plaintiff's burden to prove that the officer acted unreasonably. *See, e.g., Roundtree v. New York, 778 F. Supp. 614, 621-22 (E.D.N.Y. 1991)* (citing *Graham, 490 U.S. at 397).*

Hernandez has failed to carry this burden. In light of the circumstances confronting them, Fernandez and Rosario appeared to have used a reasonable amount [*22] of force against Hernandez, who admits that he physically resisted the officers' efforts to seize him. Hernandez testified that he "grabbed onto the pole," that he "wouldn't let go of the pole," and "once the train stopped that is when they grabbed me by force." (Hernandez Dep. at 31, 34.) Hernandez' allegation that he was pushed against a wall in the Cypress Avenue Station does not change this analysis.

The severity of plaintiff's injuries is also relevant to the consideration of whether the force used was reasonable. Here, Hernandez testified at his deposition that "they grabbed me from behind and they [threw him] out of the train . . . one grabbed me the other one held a door and helped him." (*Id.* at 34.) Although Hernandez testified that he was "hit two times in the shoulder and two time on the other shoulder," he later testified that he "wasn't hurt." Indeed, he testified that he had pain but no specific identifiable injury. (*Id.* at 50.) Furthermore, Hernandez testified (1) that he did not request medical attention on January 13, 2000 (*id.* at 49), (2) that he could not remember the approximate date on which he first visited

a doctor for treatment of his alleged [*23] injuries (*id.* at 50), and (3) that he could not definitively state that he sought treatment for such alleged injuries within one year of his arrest. (*Id.*). Accordingly, the alleged use of force during the arrest of Hernandez does not rise to the level of a constitutional violation, *Graham, 490 U.S. at 397,* and his claim for excessive force is dismissed.

Furthermore, although Hernandez alleged in the complaint that the conduct of Rosario and Fernandez was motivated by animus toward people from the Dominican Republic (Compl. P 17), he has not provided any evidence to create a triable issue of fact as to whether Rosario or Fernandez were motivated to use force against him by some improper motive.

Hernandez also alleged that he was held at gunpoint by Rosario and Fernandez. The mere fact that the officers allegedly brandished their weapons does not change the foregoing analysis. Even assuming the accuracy of plaintiff's allegations concerning the officer's use of their pistols, such use, without more, does not sustain a claim for excessive force. *See e.g., Aderonmu v. Heavey, 00 CV 9232 (AGS), 2001 U.S. Dist. LEXIS 640 at *10 (S.D.N.Y. 2001)* [*24] (holding that interrogation at gunpoint does not amount to use of excessive force).

Rather, to succeed on a § 1983 claim of excessive force, Hernandez must demonstrate that the use of force was unreasonable and that he suffered injury as a result. Based on the facts alleged, Hernandez has failed to make this showing.

### iii. The Unlawful Search Claim Is Dismissed

Hernandez' § 1983 claim is based, in part, on the allegation that during the course of his arrest at the Cypress Avenue Station, Rosario and Fernandez searched his pockets and his wallet in violation of the *Fourth Amendment.* (Compl. P 8.) This search was conducted pursuant to a lawful arrest. It is axiomatic that pursuant to a lawful arrest, an officer can search a defendant regardless of whether a search warrant has been obtained. *Chimel v. California, 395 U.S. 752, 762-763, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (U.S. 1969).* ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons . . . . In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person . . . .") Courts of this [*25] district have interpreted *Chimel* to permit the search of a defendant's wallet pursuant to a lawful arrest. *See, e.g., United States v. Vaneenwyk, 206 F. Supp. 2d 423, 426 (S.D.N.Y. 2002).* Based on *Chimel,* the search of Hernandez at the Cypress Avenue Station was permissible. Therefore, the unlawful search claim is dismissed.

**D. The §§ 1985 and 1986 Claims Against Rosario and Fernandez Are Dismissed**

As discussed above, Hernandez must offer proof of the following elements in order to create triable issues of fact as to whether Rosario and Fernandez conspired to violate his constitutional rights: (1) a conspiracy (2) for the purpose of depriving a person of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. *Smith v. Metro North Commuter R.R., 2000 U.S. Dist. LEXIS 14168, 2000 WL 1449865, at *6.* Since Hernandez has failed to provide any proof of the existence of an alleged conspiracy, the *§ 1985* claims against Rosario and Fernandez [*26] is dismissed. [5] Finally, for the reason set forth above, the *§ 1986* claims against Rosario and Fernandez are also dismissed.

> 5  It is not clear whether, pursuant to the intra-corporate conspiracy doctrine, concerted conduct by Rosario and Fernandez could constitute a conspiracy to violate Hernandez' constitutional rights. *See, e.g., Girard v. 94th St. & Fifth Ave. Corp., 530 F.2d 66, 70-72 (2d Cir. 1976).*

**E. Rosario And Fernandez Have Qualified Immunity**

Rosario and Fernandez have argued that they have qualified immunity with respect to the claims asserted by Hernandez. Qualified immunity is a doctrine aimed at "protecting government officials from suits seeking to impose personal liability for money damages based on unsettled rights or on conduct that was not objectively unreasonable." *Connell v. Signoracci[[, 153 ]]F.3d 74, 79 (2d Cir. 1998).* This doctrine is "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz, 533 U.S. 194, 200, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001)* [*27] *(quoting Mitchell v. Forsyth, 472 U.S. 511, 526, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985)).* However, the immunity is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell, 472 U.S. at 526.* Therefore it is necessary that "qualified immunity questions should be resolved at the 'earliest possible stage of litigation,'" to satisfy the goal of the doctrine. *Saucier, 533 U.S. at 201 (quoting Hunter v. Bryant, 502 U.S. 224, 227, 116 L. Ed. 2d 589, 112 S. Ct. 534 (1991)).*

The question of qualified immunity is independent from the merits of the underlying action and must be examined independent of underlying false arrest and excessive force claims. *See id. at 206; see also Washington Square Post No. 1212 Am. Legion v. Maduro, 907 F.2d 1288, 1292 (2d Cir. 1990) (citing Mitchell, 472 U.S. at 527-28)).*

Even where reasonable, competent officials could disagree as to whether the conduct at issue would violate clearly established rights, the qualified immunity defense is available. *Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986); Cartier v. Lussier, 955 F.2d 841, 846 (2d Cir. 1992).* [*28] It "protects all but the plainly incompetent or those who knowingly violate the law.'" *Saucier, 533 U.S. at 202 (quoting Malley[[, 475 U.S. at 341).* ]]

As stated by the *Saucier* court, the first step in the qualified immunity analysis is to determine whether, on the facts alleged, the official's conduct violated a constitutional right. *Id. at 200.* The next step is to determine whether "the right was 'clearly established'" at the time of the alleged incident. *Id.* The "clearly established" inquiry requires that "if the law did not put the official on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id. at 202.*

The "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

It cannot be said, based on the evidence presented, that it would have been clear to a reasonable officer under similar circumstances that the conduct at issue --*i.e.,* the arrest, the detention pursuant to that arrest, the search, and the use of [*29] force was unlawful. *See, e.g., Thomas v. County of Putnam, 262 F. Supp. 2d 241, 247 (S.D.N.Y. 2003).* Therefore, Rosario and Fernandez are entitled to qualified immunity in this action.

**F. The State Law Claims Against City Defendants Are Dismissed**

Hernandez does not have any viable federal claims against the Defendants. "In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." *Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998); see also Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir. 1994) (noting that "it is axiomatic that a court should decline to exercise jurisdiction over state-law claims when it dismisses the federal claims . . ."); Bernstein v. Misk, 948 F. Supp. 228, 243 (E.D.N.Y. 1997).* Therefore, the state law claims are dismissed.

**Conclusion**

For the foregoing reasons, summary judgment is granted in favor of the Defendants as to all of plaintiff's causes of action. However, in Defendants moving papers, they failed to specifically address the following claims: (1) the *§ 1983* illegal search claims, (2) the *§ 1985* [*30] claims, and (3) the *§ 1986* claim. To obviate any concerns over whether plaintiff, who proceeded *pro se* for the purposes of this motion, had notice of the na-

2004 U.S. Dist. LEXIS 23365, *                                    Page 8

ture and consequences of Defendants' motion, leave is hereby granted to the plaintiff to submit within twenty (20) days of entry of this opinion any factual materials that create genuine issues of material fact as to those claims not addressed in Defendants' motion papers. In the event that such materials are submitted, the Defendants must respond, if at all, within ten (10) days.

It is so ordered.

New York, NY

November 18, 2004

ROBERT W. SWEET

U.S.D.J.

LEXSEE 2002 U.S. DIST. LEXIS 4903

**LOUIS SPIES, Plaintiff, v. RICHARD BROWN, District Attorney, Queens County; JOHN DOE # 5, Assistant District Attorney; JENNIFER FRIEDMAN, Assistant District Attorney; NEW YORK CITY POLICE DEPARTMENT; JOHN DOE # 1, John McGrath; JOHN DOE # 2, Thomas Lindner; JOHN DOE # 3, 104th Precinct; LEGAL AID SOCIETY, Queens County; ROBERT MOELLER, Stand-in Attorney, Legal Aid; SHERYL PARKER, Hon. Judge; LORRIE A. ZINNO, Paralegal; LISA DRURY, ADA Records Officer; SHERYL L. ARSHADNIA, Paralegal; JANE DOE, Assistant District Attorney; ERNEST BURSTEIN, Assistant District Attorney; AN- DREW L. ZWERLING, Assistant District Attorney, FOIL Appeals Officer; DAVID KALOS, Warden Rikers Island C-76; RICHARD SOMMERS, Witness, Felony Complaint, United Commercial Salvage; JOHN DOE, Known and/or Unknown Conspirator; JACK WOHL, Assistant District Attorney; AVI LEW, Assistant At- torney General, State of New York; DENNIS C. VACCO, Attorney General, State of New York; JOHN DOE, Police Officer, Name Unknown, # 3216, 104th Precinct; and TRACY KAGAN, Esq., Defendants.**

98-CV-4708

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 4903*

**March 13, 2002, Decided**

**DISPOSITION:** The City defendants' motion to dis- miss for failure to state a claim is granted as to plaintiff's claims of conspiracy, unconstitutional prison conditions, illegal search and seizure, and as to his claims against the New York City Police Department; and the City defen- dants' alternative motion for summary judgment is granted as to plaintiff's claims of false arrest, malicious prosecution, false imprisonment, and denial of medical treatment.

**COUNSEL:** [*1] For Plaintiff or Petitioner: Lous Spies, prose, Farmingrille, NY.

For Defendant or Respondent: Gail Savetamal, New York, NY.

**JUDGES:** NINA GERSHON, Unitcd States District Judge.

**OPINION BY:** NINA GERSHON

**OPINION**

**ORDER**

**GERSHON, United States District Judge:**

Plaintiff brings this action pursuant to *42 U.S.C. § 1983* ("*Section 1983*") alleging several civil rights viola- tions against multiple defendants arising out of his arrest, guilty plea, and eight-month imprisonment. Reading his complaint liberally because of his *pro se* status (see *Haines v. Kerner, 404 U.S. 519, 520-21, 30 L. Ed. 2d 652, 92 S. Ct. 594, reh'g denied, 405 U.S. 948, 30 L. Ed. 2d 819, 92 S. Ct. 963 (1972)*), his specific allegations are that he was wrongfully arrested by New York City police officers, that a Queens Assistant District Attorney con- spired with plaintiff's Legal Aid Society attorney to deny him effective assistance of counsel and to coerce him into pleading guilty to a state charge of possessing bur- glar's tools, that he was falsely imprisoned at Rikers Is- land ("Rikers") from May 25, 1997 through January 21, 1998, and that, at the police [*2] station and during his subsequent imprisonment, he was denied medical treat- ment for his diabetes.

The Legal Aid Society, Legal Aid attorney Tracy Kagan, Legal Aid attorney Robert Moeller, Judge Sheryl Parker, former New York State Attorney General Dennis Vacco, and former Assistant Attorney General Avi Lew

have already been dismissed as defendants in this action. Those defendants who are employed by New York City (Richard Brown, Jennifer Friedman, Lorrie Zinno, Lisa Drury, Andrew Zwerling, Ernest Burstein, Jack Wohl, John McGrath, and the New York City Police Commissioner), in addition to the New York City Police Department (collectively, "the City defendants"), now move to dismiss plaintiff's claims against them for failure to state a claim or, in the alternative, for summary judgment.

In deciding a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, the court must accept all of plaintiff's allegations as true and dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. Motions for summary [*3] judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See *Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995)*. The moving party must demonstrate the absence of any material factual issue genuinely in dispute. See id. The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000)*. However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)*, cert. denied, *480 U.S. 932, 94 L. Ed. 2d 762, 107 S. Ct. 1570 (1987)*. The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. [*4]

The City defendants' motion for summary judgment on plaintiff's claims of false arrest, malicious prosecution, and false imprisonment is granted. For a *Section 1983* plaintiff to "recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," he must show that his "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck v. Humphrey, 512 U.S. 477, 486-87, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994); Berman v. Turecki, 885 F. Supp. 528, 532 (S.D.N.Y. 1995)*. Spies must make such a showing, because his plea of guilty to possessing burglar's tools constitutes a conviction, *Morris v. Reynolds, 264 F.3d 38, 48-49 (2d Cir. 2001)*, and his *Section 1983* claims for false arrest, mali-

cious prosecution, and false imprisonment are constitutional challenges to that conviction. Since Spies's conviction has in no way been invalidated, these claims [*5] cannot stand.

Spies's allegation that his conviction was defective because he "had no other choice [than] to plead guilty," Complaint at 4, does not alter this conclusion. At his plea proceeding, the judge engaged Spies in an extensive colloquy that demonstrated the voluntariness of his plea. She asked Spies, "it is my understanding you wish to plead guilty to the crime of criminal possession of burglars tools, an A misdemeanor, is that what you wish to do?" Spies answered "Yes." The court continued, "It is charged that on May 23, 1997 at approximately 3:20 p.m. in front of 1717 Troutman Street in Queens County, that you were in possession of burglars tools, in that you had in your possession a screwdriver and that was an instrument which you were going to use to take property which did not belong to you, is that true?" Spies responded, "Yes." The court then asked Spies, "Has anyone threatened you in order to get you to plead guilty?" Spies responded, "No." The judge further asked Spies, "Has anyone made any promises other than the promise that you will be sentenced to one year incarceration, has any other promise been made to you?" Spies replied, "No." The judge asked Spies whether [*6] he understood "that by pleading guilty you give up certain rights, you give up your right to trial by jury where the prosecution would have to prove the case against you beyond a reasonable doubt; you give up your right to confront and cross examine witnesses who might appear and testify against you and you give up your right to remain silent, do you understand?" Spies responded, "Yes." Finally, the court asked Spies, "Have you discussed all this with your lawyer here beside you," and Spies responded, "Yes." Savetamal Decl. Ex. C at 3-4.

As the Supreme Court has held,

> The representations of the defendant, his [or her] lawyer, and the prosecutor at [the original plea] hearing . . . constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

*Blackledge v. Allison, 431 U.S. 63, 73-74, 52 L. Ed. 2d 136, 97 S. Ct. 1621 (1977)* (citations omitted); see *United States v. Hernandez, 242 F.3d 110, 112 (2d Cir.*

*2001)* [*7] (quoting *Allison*); *United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997)* (a "defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea"). Because Spies's allegations of involuntariness are purely conclusory and contradict his statements during his plea allocution, they are entitled to no weight here.

In a related claim, plaintiff argues that his Legal Aid attorney conspired with the Assistant District Attorney on his case to secure his guilty plea in order to "cover-up police negligence." Plaintiff's Statement ("Stmt.") at 3. This claim, already dismissed as against the Legal Aid Society defendants, must also be dismissed against the District Attorney and his employees, because plaintiff offers no factual basis for his conclusory allegations of conspiracy. See *Ostrer v. Aronwald, 567 F.2d 551, 553 (2d Cir. 1977)* ("complaints containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed") (citations omitted); *Dwares v. City of New York, 985 F.2d 94, 99-100 (2d Cir. 1993)* [*8] (same).

Spies also challenges the constitutionality of the conditions of his confinement at Rikers. He asserts that, when he was assigned to C-76, dorm 6 lower, "there [were] two inches of water in the bathroom, no pillows, no towels, no sheets, and no blankets, for over a month until I was moved to dorm seven upper." Complaint at 5. In addition, he complains of "being forced to eat food that had hair, bugs, cigarette butts and many other toxins in it"; "being subjected to an environment that had 140 slashing[s] a month[,] Aids [sic], TB, etc."; and "being subject to an environment [where] officers were high on drugs and alcohol[,] not to mention when they all got arrested that environment got a lot worse including their state of mind." Id. at 5-6.

This claim must be dismissed. A defendant cannot be liable for damages under *Section 1983* unless he was personally involved in the constitutional deprivations alleged. *Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001)*; *Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986)*. A defendant may be personally involved in a constitutional deprivation in the following ways: (1) by directly participating [*9] in the challenged conduct; (2) as a supervisory official, by failing to remedy the wrong after having learned of it; (3) as a supervisory official, by creating or perpetuating a policy or custom under which unconstitutional practices occurred; or (4) as a supervisory official, through gross negligence in managing the subordinates who caused the unlawful condition or event. *Williams, 781 F.2d at 323-24*. Because none of the City defendants is alleged even to have worked at Rikers, let alone to have had direct or supervisory responsibility for inmate conditions there, they were not personally involved in any alleged neglect of those conditions. Therefore, the City defendants' motion to dismiss Spies's prison conditions claim for failure to state a claim is granted. [1]

1   Spies's complaint named only one defendant actually associated with Rikers: David Kalos, whom Spies describes as warden of the Rikers facility where he was incarcerated. However, Kalos was never served with the summons and complaint and thus is not a party to this action. Furthermore, nowhere in his complaint or attached statement does Spies allege that Kalos had personal involvement in the particular substandard prison conditions of which he complains.

[*10]   In yet another claim, Spies asserts that he was denied proper medical treatment for his diabetes, both at the 104th Precinct station house following his arrest and during his incarceration at Rikers. The only allegations in Spies's complaint are that (1) he told an unidentified officer at the 104th Precinct that he "needed medical treatment I'm a diabetic" and the officer "just ignored my request," Complaint at 4, leaving him without insulin from the time of his arrest at approximately 3:00 p.m. on May 23, 1997 until about 1:45 a.m. on May 25, 1997, when he was brought to Rikers; and (2) unknown individuals caused him to be "denied access to medical twice daily from May 23, 1997 to January 21, 1998," Complaint at 5, the period of his incarceration. Because these allegations fail to support the implication that any named City defendant had personal involvement in the conduct Spies challenges, his denial of medical treatment claim must be dismissed for failure to state a claim.

Even if Spies's complaint is read to incorporate the allegations from his reply and sur-reply papers, his medical care claim cannot survive. Regarding his treatment at the 104th Precinct, Spies's sole additional [*11] allegation is that "police officers McGrath, Lindner, and Jason Doe # 3 knew and totally disregarded plaintiff's rights to medical care. Knowledge was known by plaintiff's diabetic injection card in his wallet where they found my I.D. and related paperwork, my name address etc. I did not give it to them 'verbally.'" Plaintiff's Opposition ("Opp.") at 17. The City defendants do not contest Spies's claim that he was not given any insulin during the one and one half days he was held at the 104th Precinct, but submit uncontested medical records showing his condition at the time he entered Rikers to have been normal and his diabetes during the period of his confinement to have been under control. Dunn Decl. PP3, 6.

Lindner and "Jason Doe # 3" were never served and thus are not parties to this case. As for McGrath, even treating the complaint as amended to allege McGrath's

personal involvement in denying plaintiff medical care at the 104th Precinct, Spies has made no allegation that the delay in giving him insulin until he reached Rikers caused him any actual harm. Delay in the rendering of medical treatment "in and of itself does not rise to the level of a constitutional violation"; to [*12] demonstrate such a violation, "a plaintiff must show that he sustained substantial harm because of the delay in the rendering of medical treatment." *Smith v. Montefiore Medical Center-Health Services Division, 22 F. Supp. 2d 275, 280 (S.D.N.Y. 1998)* (citation omitted). Because Spies has made no such allegation, his claim regarding denial of medical treatment at the 104th Precinct does not state a claim.

Finally, even if the complaint is treated as sufficient, plaintiff cannot survive the City defendants' summary judgment motion because he has not raised a factual issue regarding any harm caused by the delay. Spies's medical records indicate that when he first entered Rikers he was evaluated by medical providers, who found that his appearance was normal, well-developed, and well-nourished. Dunn Decl. P3. Moreover, the intake form the providers filled out upon examining Spies contained no indication that plaintiff complained of symptoms associated with diabetes, such as seizures, coma, blindness, circulatory disorders, kidney problems, or peripheral nerve disorders. Id.

Nor can Spies's claim regarding medical treatment at Rikers survive the City defendants' motion [*13] to dismiss. In his post-complaint submissions, Spies explains that he was not altogether denied medical care at Rikers, but rather that prison officials mismanaged the care of his diabetes. First, he claims that while "medical standards" mandate that diabetics receive insulin injections every ten hours, Rikers officials arranged for his injections to be administered every twelve hours. Opp. at 4. Second, he alleges that, despite the twelve-hour schedule, he actually received his insulin injections "at all different times . . . . times were always changing due to 'in part' from officers calling late or red lights alarms, etc. fights slashings etc." Id. Because of these delays, Spies claims, his blood sugar "was far from under control" during the first part of his incarceration, only "coming in control around October 3, 1997." Plaintiff's Reply at 7; Opp. at 3.

To state a claim under *Section 1983* for deprivation of medical treatment in violation of the *Eighth Amendment*, however, a plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000)* (quoting *Estelle v. Gamble, 429 U.S. 97, 104, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)).* [*14] Mere negli-

gence in treating a medical condition does not constitute deliberate indifference and thus does not amount to an *Eighth Amendment* violation. *219 F.3d at 139* (quoting *Estelle, 429 U.S. at 105-06).* Because the alleged care of Spies's diabetes at Rikers was at most negligent, Spies's challenge to that care must be dismissed. Rather than evidencing deliberate indifference or even negligence, in fact, Spies's undisputed medical records indicate that he received daily medical attention for his diabetes throughout the time he was confined at Rikers. Dunn Decl. P4. Thus, even if Spies stated a claim, the City defendants are entitled to summary judgment.

The City defendants' motion to dismiss any claims as against the New York City Police Department is granted, because, as an agency of New York City, the Police Department has no capacity to be sued. See, e.g., *Wilson v. City of New York, 800 F. Supp. 1098, 1101 (E.D.N.Y. 1992).*

Finally, insofar as Spies could be viewed as complaining that the police officers who arrested him illegally searched him at the time of his arrest and illegally seized the items in his pocket, see [*15] Stmt. at 4, his claim must be dismissed. To recover damages for an illegal search under *Section 1983*, the "plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury." *Humphrey, 512 U.S. at 487.* Merely being arrested and convicted, as Spies alleges, unless the conviction has been overturned, does not constitute the requisite injury. Id.

For the foregoing reasons, the City defendants' motion to dismiss for failure to state a claim is granted as to plaintiff's claims of conspiracy, unconstitutional prison conditions, illegal search and seizure, and as to his claims against the New York City Police Department; and the City defendants' alternative motion for summary judgment is granted as to plaintiff's claims of false arrest, malicious prosecution, false imprisonment, and denial of medical treatment. This order is dispositive of this action, because none of the remaining individuals named in the complaint caption were served. The Clerk of Court is therefore directed to enter judgment for the defendants and to close this case.

**SO ORDERED.**

**NINA GERSHON**

**United States District Judge**

   **Dated:  [*16]  March 13, 2002**

   **Brooklyn, New York**

LEXSEE 1997 U.S. DIST. LEXIS 15999

**ARTEZ HOUSTON, Plaintiff, -against- NEW YORK STATE TROOPERS, TRP. MICHAEL BROWN, and THOMAS CONSTANTINE, Defendants.**

**96 Civ. 1587 (DAB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 15999*

**October 10, 1997, Decided**
**October 15, 1997, Filed**

**DISPOSITION:**    [*1] Defendants' Motion to Dismiss GRANTED. Complaint dismissed. Plaintiff's Motion for Leave to File Amended Complaint DENIED.

**COUNSEL:** ARTEZ HOUSTON, PLAINTIFF, Pro se.

For DEFENDANTS: Alpha J. Sanghvi, Assistant Attorney General, of Counsel, DENNIS C. VACCO, Attorney General of the State of New York, New York, New York.

**JUDGES:** DEBORAH A. BATTS, U.S.D.J.

**OPINION BY:** DEBORAH A. BATTS

**OPINION**

*MEMORANDUM AND ORDER*

DEBORAH A. BATTS, United States District Judge.

*Pro se* Plaintiff, Artez Houston ("Plaintiff"), filed a Complaint under the Civil Rights Act of 1871, *42 U.S.C. § 1983*, against Defendants New York State Troopers, [1] Trooper Michael Brown and Thomas Constantine. [2] Defendants move to dismiss the Complaint, pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, for failure to state a claim or, in the alternative, for a more definite statement and dismissal of the claims against New York State Troopers. In response to Defendants' motion, Plaintiff cross moves for leave to file an Amended Complaint. For the reasons stated below, Defendants' motion is granted. Plaintiff's motion to replead is denied.

1  Throughout his Complaint Plaintiff makes reference to the New York State Troopers. The actual name of the agency is the New York State Police.

[*2]

2  Thomas Constantine is the former Superintendent of the New York State Police.

I. BACKGROUND

On March 5, 1996, *pro se* Plaintiff, Artez Houston, filed a Complaint pursuant to *42 U.S.C. § 1983* alleging violations of his constitutional and civil rights resulting from a search and seizure. Plaintiff alleges that Michael Brown and his unnamed partner, both New York State Troopers, pulled Plaintiff's car over on the New York State Thruway and asked Plaintiff for his license and registration. (Compl. P 4.) Plaintiff alleges that he showed the police officers the requested items, which were both valid. (*Id.*) After showing the police officers his license and registration, the officers asked Plaintiff to "step out of" his car, he complied, and was then frisked by the officers. (*Id.*) Plaintiff alleges that after being frisked, he returned to his car and then Officer Brown's unnamed partner conducted an unauthorized search of his car. (*Id.*) Plaintiff further alleges that after approximately twenty (20) elapsed, Officer Brown asked Plaintiff to step out of his car again and when [*3] Plaintiff asked why, Officer Brown grabbed him by the shirt and pulled him out of the car. (*Id.*) Once out of the car, Plaintiff alleges that Officer Brown grabbed him by his testicles, pushed him against the car, and pulled contraband from his underwear. (*Id.*) Plaintiff alleges that as a result of the Defendants' actions, he suffered an injury to his testicles and "[a] lot of mental and emotional stress. (*Id.* P IV-A.)

Defendants move to dismiss the Complaint, pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, for failure to state a claim, or in the alternative, for a more definite statement and dismissal of the claims against New York State Troopers. Specifically, Defendants claim that Complaint is vague and conclusory, fails to allege any particularized facts directed at any of the Defendants, and that Plaintiff fails to specify which of his rights were violated. Furthermore, to the extent that Plaintiff's Complaint is construed to name New York State Police as a Defendant, Defendants claim that the *Eleventh Amendment* bars this action against that Defendant.

In response to Defendants' motion, Plaintiff cross moves for leave to amend his Complaint.

## [*4] II. DISCUSSION

### A. Rule 12(b)(6) Motion

As an initial matter, the Court notes that where a plaintiff proceeds *pro se*, a court must liberally construe the complaint and "'interpret [it] to raise the strongest arguments that [it] suggest[s],'" *Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995)* (quoting *Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994))*, thus holding the *pro se* pleading "'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe, 449 U.S. 5, 9, 66 L. Ed. 2d 163, 101 S. Ct. 173 (1980)* (per curium) (quoting *Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972))*; *see also Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 130 L. Ed. 2d 63, 115 S. Ct. 117 (1994).*

In deciding a *Rule 12(b)(6)* motion, the Court must read the complaint generously, accepting as true the factual allegations in the complaint and drawing all inferences in favor of the pleader. *Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469; Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).* The District Court should grant such a motion only if after viewing Plaintiff's [*5] allegations in this favorable light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992), cert. denied, 507 U.S. 961, 122 L. Ed. 2d 762, 113 S. Ct. 1387; see also, Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991), cert. denied, 503 U.S. 960, 112 S. Ct. 1561, 118 L. Ed. 2d 208 (1992)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).* Because a 12(b)(6) motion is used to assess the legal feasibility of a complaint, a Court should not "assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (1984).* Rather, the Court

must limit its consideration to the facts that appear on the face of the complaint. *Id.*

Construing the Complaint liberally, it appears that Plaintiff alleges two causes of action, one for an unlawful search in violation of the *Fourth Amendment* and the second for excessive force used during the course of his arrest.

### 1. Unlawful Search

It is well-established that a defendant who [*6] pleads guilty waives any challenge to the constitutionality of his arrest, interrogation, search and prosecution. *Berman v. Turecki, 885 F. Supp. 528, 533 (S.D.N.Y. 1995)* (quoting *Reese v. York, 571 F. Supp. 1046, 1048 (N.D. Tex. 1983)).* After Officer Brown seized contraband from the Plaintiff, Plaintiff was arrested and charged with possession of a controlled substance. On March 5, 1996, judgment was entered in the County Court, Rockland County (Nelson, J.), convicting Plaintiff of criminal possession of a controlled substance in the second degree upon his plea of guilty. *People v. Houston, 657 N.Y.S.2d 343 (N.Y. App. Div. 2d Dep't 1997).* The judgment was unanimously affirmed on appeal. *Id.* By pleading guilty, Plaintiff waived his right to object to the constitutionality of the search performed by Officer Brown and his partner and the claim is hereby dismissed. *See United States v. Arango, 966 F.2d 64, 66 (2d Cir. 1992)* (citing *Tollett v. Henderson, 411 U.S. 258, 267, 36 L. Ed. 2d 235, 93 S. Ct. 1602 (1973))*; *see also United States v. Doyle, 348 F.2d 715, 718 (2d Cir.), cert. denied, 382 U.S. 843, 15 L. Ed. 2d 84, 86 S. Ct. 89 (1965); Berman, 885 [*7] F. Supp. at 533; Roundtree v. City of New York, 778 F. Supp. 614, 620 (E.D.N.Y. 1991).*

Plaintiff's unlawful search claim is also barred pursuant to the Supreme Court's holding in *Heck v. Humphrey, 512 U.S. 477, 486-87, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994).* In *Heck*, the Court held that in order to recover for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal . . . or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* In assessing a § 1983 claim, *Heck* requires the district court to "consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction" and, if it would, the complaint must be dismissed unless the plaintiff can establish that his conviction has already been invalidated. *Id. at 487.*

Here, if the Court were to find that the search conducted by Defendants was unlawful, such a finding would imply that Plaintiff's conviction is invalid. Thus, to avoid dismissal of his unlawful search claim, Plaintiff must establish that his conviction [*8] has been invalidated. Plaintiff cannot make such a showing, especially

in light of the recent affirmance of his conviction on appeal. *See People v. Houston, 657 N.Y.S.2d at 343.* Accordingly, because Plaintiff's conviction has been affirmed on appeal, this Court is barred from considering his unlawful search claim and the claim is hereby dismissed.

### 2. Excessive Force Claim

Construing the Complaint liberally, Plaintiff also alleges a cause of action for excessive force used by the police during his arrest. Specifically, Plaintiff alleges that Officer Brown injured Plaintiff's testicles when he reached into Plaintiff's underwear to seize contraband. Plaintiff's claim of excessive force is not barred under *Heck* because a finding by this court in favor of Plaintiff would not render his conviction invalid. *See, e.g., Roundtree, 778 F. Supp. at 621-22.*

Where an excessive force claim arises in the context of an arrest, the claim should be evaluated on a reasonableness standard. *Id. at 621.* The court should determine whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them. *Graham v. Connor, 490 U.S. 386, 397,* **[\*9]** *104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989).* A court must therefore adopt the perspective of a reasonable officer on the scene of the arrest and it must understand that not every push or shove . . . violates the *Fourth Amendment. Id.* In determining whether the use of force was reasonable, the court should examine the need for the application of force, the relationship between the need and the amount of force used, the extent of injury inflicted, and whether the force was applied in good faith or maliciously and sadistically. *Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S. Ct. 462, 38 L. Ed. 2d 324 (1973).*

A complaint that fails to allege an unreasonable excessive use of force may be dismissed for failure to state a claim. *Roundtree, 778 F. Supp. 614 at 621.* Such a dismissal would be proper only "if it is absolutely certain that [plaintiff] can establish no facts to show that he was subjected to an unreasonable use of force by the arresting officers." *Id.* Here, reading the Complaint generously, accepting as true the allegations in the Complaint, and drawing all inferences in favor of the pleader, the Court finds that Plaintiff cannot establish that the arresting officers **[\*10]** used unreasonable excessive force.

Plaintiff alleges that Officer Brown grabbed him by his testicles, pushed him against the car and seized the contraband that was in his underwear. (Compl. P IV(9)-(10).) Although Plaintiff alleges that he suffered an injury to his testicles, he admits that he did not receive any medical attention. (*Id.* at IV-A.) In fact, Plaintiff only alleges to have suffered "emotional and mental stress." (*Id.*) In *Roundtree,* the court dismissed a § 1983 claim

based on the use of excessive force where plaintiff only alleged emotional and mental stress after being pushed by the police into a car. *778 F. Supp. at 620, 623.* Although Plaintiff here alleges an injury to his testicles in addition to emotional and mental stress, such a general, non-specific allegation does not lead this Court to find that Officer Brown acted unreasonably. On the contrary, in light of the facts and circumstances confronting the police officers, the Court finds that Officer Brown and his partner acted reasonably.

The search that Plaintiff complains of took place on a busy public highway with automobile traffic that posed a potential threat to the police officers and Plaintiff. **[\*11]** The area in which Plaintiff was searched was not secure, and thus there was the possibility that Plaintiff could flee or attempt to discard the contraband. There is also the possibility that the police officers became aware of the contraband during the frisk they conducted minutes earlier and, in light of the public area in which the search took place, felt the need to act swiftly to secure the contraband before it could be discarded. The amount of force used in seizing the contraband was also reasonable in light of the police officers' need to secure quickly the contraband, and there is no indication that the force was applied maliciously or sadistically. *See Johnson, 481 F.2d at 1033.*

In light of these factors and the circumstances confronting the police officers at the time of the search, the Court finds that even under the most charitable reading of the Complaint the Plaintiff can establish no set of facts to show that he was subjected to an unreasonable use of force by Officer Brown and his partner. *See Roundtree, 778 F. Supp. at 621; see also Mark v. Caldwell, 754 F.2d 1260, 1261 (5th Cir.), cert. denied, 474 U.S. 945, 88 L. Ed. 2d 287, 106 S. Ct. 310 (1985)* **[\*12]** (repeated slaps in face by police officers amounted to more of an affront than an injury sufficient to sustain § 1983 claim because Plaintiff suffered no injuries requiring medical attention). Accordingly, Plaintiff's excessive force claim is dismissed.

### B. Leave To Replead

*Rule 15(a) of the Federal Rules of Civil Procedure* provides that leave to amend a pleading "shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a); see also Richardson v. Greenshields Securities, Inc., 825 F.2d 647, 653 n.6 (2d Cir. 1987).* In the absence of undue delay, bad faith, or undue prejudice to the opposing party, federal courts routinely grant motions for leave to amend. *Tokio Marine & Fire Ins. Co. v. Employers Ins. of Wausau, 786 F.2d 101, 103 (2d Cir. 1986).* "The granting of leave to amend a pleading is within the sound discretion of the district." *Campo v. 1st Nationwide Bank, 857 F. Supp. 264, 269 (E.D.N.Y. 1994).* However,

leave to amend may be denied if the amendment would be futile. *In Re American Express Co.*, 39 F.3d 395, 402 (2d Cir. 1994).

Along with his opposition to Defendants' motion, Plaintiff submitted a proposed Amended Complaint to the Court. The proposed **[*13]** Amended Complaint deletes Defendants New York State Troopers and Thomas Constantine, specifically identifies Officer Brown as the officer who grabbed Plaintiff's testicles, and adds an allegation that Officer Brown violated Plaintiff's "right against unlawful search and seizures and used excessive force." (Proposed Am. Compl. P IV.)

Construing Plaintiff's proposed Amended Complaint liberally, the Court finds that Plaintiff fails to allege sufficiently any cognizable claims. As discussed above, Plaintiff's unlawful search claim has both been waived and is barred pursuant to the court's holding in *Heck v. Humphrey*, 512 U.S. 477, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994). *See supra* Al. Plaintiff also fails to state a claim for excessive force because he fails to plead any additional facts under which the Court could find that Officer Brown's use of force was unreasonably excessive

under the circumstances. Accordingly, granting Plaintiff permission to replead would be futile in light of the deficiencies in the proposed Amended Complaint. Plaintiff's motion for leave to file an Amended Complaint is denied. Because the Court has dismissed all of Plaintiff's claims and has not granted **[*14]** Plaintiff leave to replead, the Court need not address Defendants' *Eleventh Amendment* claim.

III. CONCLUSION

Defendants' Motion to Dismiss is GRANTED. The Complaint is dismissed in its entirety. Plaintiff's Motion for Leave to File an Amended Complaint is DENIED.

SO ORDERED

DATED: New York, New York

October 10, 1997

DEBORAH A. BATTS

U.S.D.J.

LEXSEE 2002 U.S. DIST. LEXIS 14475

**UNITED STATES OF AMERICA, -v.- ANTHONY GREGG, Defendant.**

**01 Cr. 501 (LAP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 14475*

**August 5, 2002, Decided**
**August 6, 2002, Filed**

**SUBSEQUENT HISTORY:** Subsequent appeal at, *Remanded by United States v. Gregg, 2004 U.S. App. LEXIS 13637 (2d Cir. N.Y., July 1, 2004)*

**DISPOSITION:**    [*1] Defendant's motion to suppress and requested jury charge denied.

**COUNSEL:** US Attorneys: Harry Sandick, Assistant United States Attorney, United States Attorney Office, New York, NY USA.

**JUDGES:** LORETTA A. PRESKA, United States District Judge.

**OPINION BY:** LORETTA A. PRESKA

**OPINION**

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, United States District Judge:

Defendant Anthony Gregg ("Gregg") has moved pursuant to *Rule 12(b) of the Federal Rules of Criminal Procedure* for (1) an order suppressing physical evidence taken from his person during his arrest on March 20, 2001 and (2) a ruling permitting the defenses of innocent possession and necessity to be presented at trial. Oral argument was held on June 10, 2002. For the reasons set forth below, Gregg's motions are denied.

BACKGROUND [1]

1    Unless otherwise noted, the following facts are taken from Gregg's grand jury testimony of April 2, 2001. In its Memorandum of Law in Opposition to Anthony Gregg's Pretrial Motions, the government disputes Gregg's version of the facts

with regard to statements Gregg allegedly made at the time of his arrest. (Gov.'s Mem. Law Opp'n Mot. at 4). Gregg has moved to suppress these statements on the ground that they were taken in violation of his *Fifth Amendment* right to remain silent. (Def.'s Mem. Law Supp. Mot. at 7-8). Pursuant to Gregg's request by letter dated June 3, 2002, I adjourned the hearing regarding Gregg's *Fifth Amendment* claims pending resolution of the instant motion. Accordingly, Gregg's *Fifth Amendment* claims are not addressed herein.

[*2]    On March 19, 2001, Gregg visited his aunt to retrieve some of his deceased mother's belongings. Among the items he took was his mother's disability Metrocard, because, according to Gregg, he had no other wallet-sized photograph of her. (Transcript of Grand Jury Testimony of 4/2/01 ("Tr.") at 6). The next morning, on March 20, 2001, Gregg's wife delivered their daughter, and Gregg spent part of the day at a friend's apartment "to discuss the birth of his child and his 'happiness.'" (*Id.* at 6-7). Gregg left that apartment between 10:00 and 11:00 p.m. and began his trip home (Def.'s Mem. Law Supp. Mot. ("Def. Mem.") at 3), heading toward the subway station at the corner of Anderson and 166th Street. (Tr. at 8). Gregg claims to have noticed a glare amid some debris that had settled at the bottom of a set of stairs. (*Id.* at 8, 12). When Gregg stopped to examine the glare, he realized that it was a gun. According to Gregg, he picked up the gun and continued toward the subway with the intention of turning it over to the 40th Precinct, which is located at 138th Street and Third Avenue, three blocks from Gregg's residence, in order to claim a three hundred dollar reward. (*Id.* at [*3]  8-9). When he reached the station, Gregg thought he heard an uptown train pulling in, so he rushed through the turnstile using his mother's Metrocard. (*Id.* at 9). Once through, however, Gregg realized that the train was not heading in his direction, so he sat on a bench to wait.

.As Gregg waited for the train, two plainclothes officers questioned him, asking to see the card that he had used to enter the subway system. (*Id.*). Gregg handed the officers the disability Metrocard that he had used, as well as his social security and Medicaid cards, all of which showed the same surname. (*Id.* at 9-10). When Gregg could not produce identification with a photograph of himself, the officers placed his hands on the wall and patted him down. (*Id.* at 10). Subsequently, the officers found the gun, a .380 semiautomatic pistol, in Gregg's waistband (Tr. at 10; Gov.'s Mem. Law Opp'n Mot. "Gov. Mem." at 3). Gregg was arrested on four violations of state law: criminal possession of a weapon in the third degree (loaded weapon), criminal possession of stolen property in the fifth degree, theft of services, and criminal impersonation. (Gov. Mem. at 3). Gregg, a prior felon, also was charged [*4] in a one-count indictment with unlawful possession of a firearm that had been transported in interstate commerce, in violation of Title 18, *United States Code, section 922(g)*, and was arrested on June 5, 2001. (*Id.* at 2).

On April 2, 2001, Gregg pleaded guilty to the state charge of criminal impersonation in the second degree. Also on that date, Gregg testified before a Bronx grand jury regarding the events of March 20 and the state gun-related charge of criminal possession of a weapon in the third degree. During his testimony, Gregg admitted that he was in possession of a gun at the time of his arrest. (Tr. at 10). The grand jury, however, did not return a true bill. (Def. Mem. at 2). Gregg subsequently received a fifteen-day sentence for criminal impersonation pursuant to the guilty plea that he entered in the state proceeding. (Gov. Mem. at 3). With respect to the federal charge of unlawful possession of a firearm, Gregg now moves to suppress the gun found on his person and also argues that the jury should be charged on the defenses of necessity and innocent possession.

DISCUSSION

I. Suppression Motion

Gregg first moves to suppress the gun on the [*5] ground that the officers lacked reasonable suspicion to stop him. However, because he pleaded guilty on April 2, 2001 to the criminal impersonation offense for which the March 20 arrest initially was made, Gregg has waived any such *Fourth Amendment* challenges. Therefore, Gregg's motion to suppress is denied. [2]

2  I note that at the June 10, 2002 oral argument, the government offered to provide evidence that flashing lights at the turnstile indicated to the officers that Gregg (who is not outwardly disabled) had used a disability Metrocard, thus giving them reasonable suspicion to justify the stop. Such in-

formation, however, did not appear in the government's papers in opposition to Gregg's pretrial motions and therefore is not considered here.

The Supreme Court has held that:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, [*6] he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

*Tollett v. Henderson, 411 U.S. 258, 267, 36 L. Ed. 2d 235, 93 S. Ct. 1602 (1973)*. Thus, a defendant who enters a guilty plea in a criminal proceeding may not subsequently challenge the events that led up to that proceeding on *Fourth Amendment* grounds. [3] *See, e.g., United States v. Arango, 966 F.2d 64, 66 (2d Cir. 1992)* (holding that by pleading guilty, a criminal defendant waived his right to object to the constitutionality of a search of his van); *Cameron v. Fogarty, 806 F.2d 380, 387 (2d Cir. 1986)* (holding that a conviction following an arrest "is viewed as establishing the existence of probable cause"); *United States v. Doyle, 348 F.2d 715, 718 (2d Cir. 1965)* (holding that by pleading guilty, defendant waived all non-jurisdictional defects). Because Gregg pleaded guilty to criminal impersonation, he may no longer challenge the constitutionality of his March 20 stop and arrest.

3  It is true that the *Tollett* Court left open to defendants the opportunity to "attack the voluntary and intelligent character of the guilty plea." *Tollett, 411 U.S. at 267*. But to do so successfully, a defendant must demonstrate that the guilty plea was entered into on counsel's advice that was not within "the range of competence demanded of attorneys in criminal cases." *Id.* (quoting *McMann v. Richardson, 397 U.S. 759, 771, 25 L. Ed. 2d 763, 90 S. Ct. 1441 (1970))*. Gregg, however, has raised no such claim regarding his decision to plead guilty to criminal impersonation.

[*7]  In Gregg's letter to the Court dated October 29, 2001, in further support of the motion to suppress, Gregg correctly points out that the cases cited by the government only address instances in which either a defendant pleaded guilty to federal charges and subsequently was barred from raising *Fourth Amendment* chal-

lenges in federal proceedings or a federal civil rights plaintiff was convicted of a crime and subsequently was barred from claiming false arrest. (Letter from Gregg to the Court of 10/29/01, at 1). Gregg argues that his plea, which was made in state court, should not bar a *Fourth Amendment* challenge in federal court because "none of the cases cited [by the government] stand[s] for the proposition . . . that by failing to contest the constitutionality of his arrest in state court, a defendant unequivocally waives all objections to that arrest in any context, including those that would be made in federal court on charges not extant at the time of the state proceeding." (*Id.*) In addition, Gregg argues that his guilty plea was not "understandingly made" because he did not know, at the time of his plea, that it could affect his rights in a subsequent federal case. ( [*8] *Id.* at 2).

The reasoning of *Tollett* and its progeny applies with equal force here, even though Gregg pleaded guilty in state court and also was charged in federal court. Gregg's plea in state court cannot be disregarded merely on the basis of the venue in which it was entered. While he may not have realized what its consequences would be in federal court, it is well established that "the principal value of counsel to the accused in a criminal prosecution often does not lie in counsel's ability to recite a list of possible defenses in the abstract . . . ." *Tollett*, 411 U.S. at 267-68. Thus, the mere fact that counsel might not recite each and every possible adverse consequence of a guilty plea does not make the plea unknowing or otherwise inoperative. Moreover, "[a] prospect of plea bargaining, the expectation or hope of a lesser sentence, or the convincing nature of the evidence against the accused are considerations that might well suggest the advisability of a guilty plea without elaborate consideration of whether pleas in abatement . . . might be factually supported." *Id.* at 268. Thus, Gregg's tactical decision to plead guilty was "understandingly [*9] made"; it was part of an overarching strategy employed during the state proceedings and had both beneficial and detrimental consequences for Gregg. Litigation strategy of any kind usually involves risks such as the one Gregg has encountered here, but it would be unreasonable to expect that defense counsel could advise a client about every possible consequence of his plea. Accordingly, Gregg's motion to suppress is denied.

## II. Defenses

Gregg also requests that the jury be instructed on the defenses of necessity and innocent possession. While *section 922(g)* does not provide for such defenses, some courts have allowed them in certain, limited circumstances. *See, e.g., United States v. Deleveaux, 205 F.3d 1292 (11th Cir. 2000)* (holding that the defense of justification may be available in a *section 922(g)* felon in possession case, but only in extraordinary circum-

stances); *United States v. Gomez, 92 F.3d 770 (9th Cir. 1996)* (holding that a justification defense is available under *section 922(g)*); *United States v. Mason, 344 U.S. App. D.C. 91, 233 F.3d 619 (D.C. Cir. 2000)* (recognizing an innocent possession defense to a *section 922(g)* [*10] charge). Because Gregg faced no imminent threat and had reasonable alternative courses of action available to him, however, neither of these defenses is appropriate here. Moreover, recognition of the innocent possession defense runs counter to the plain language and underlying intent of the statute itself. Accordingly, Gregg's motion is denied.

### A. Necessity

Gregg seeks a ruling permitting the defense of necessity and argues that he was forced either to leave the gun for somebody else to find and possibly use or to take possession of it himself and return it to the police. (Def. Mem. at 11-12). As a preliminary matter, however, the Supreme Court has stated that "it is an open question whether federal courts ever have authority to recognize a necessity defense not provided by statute." *United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 490, 149 L. Ed. 2d 722, 121 S. Ct. 1711 (2001)* (holding that the Controlled Substances Act reflects Congress' determination that marijuana has no medical benefits, and therefore a medical necessity defense cannot justify distribution of the drug). The Court further noted that it had never recognized a necessity defense to [*11] justify a violation of a federal statute because to do so "would entail a social balancing that is better left to Congress." *Id.* at 491 n.4. Such a defense therefore only applies in the most rare and exceptional of circumstances and generally not when it would be at odds with Congress' intent as evidenced by the terms of the underlying statute. *Id.* at 491. Indeed, as the Court of Appeals for the Seventh Circuit stated, "the defense of necessity will rarely lie in a felon-in-possession case unless the ex-felon, not being engaged in criminal activity, does nothing more than grab a gun with which he or another is being threatened." *United States v. Perez, 86 F.3d 735, 737 (7th Cir. 1996)*.

Generally speaking, the Second Circuit does recognize that necessity can justify a criminal act when that "'necessity' [is] compelling, leaving no other course of conduct." *United States v. Hescorp, Heavy Equipment Sales Corp., 801 F.2d 70, 78 (2d Cir. 1986)* (holding that, while necessity defense did not apply to defendant corporation that had made illegal shipments to Iran, the defense may apply when there exists no reasonable, legal [*12] alternative to illegal conduct). The closest that the Court of Appeals has come to considering a case such as Gregg's is *United States v. Smith*, in which a convicted felon claimed that his unlawful possession of a firearm was necessary to prevent violence at the youth center in

which he worked. *160 F.3d 117 (2d Cir. 1998).* Smith pleaded guilty, but later appealed, claiming that the district court failed to explore adequately a possible necessity defense when it ascertained the factual basis for his guilty plea. The Court of Appeals found that because Smith had already admitted to the three elements of the crime, the district court was not obliged to assess any possible justification theories. [4] *Id. at 121-22.* The court, however, ultimately declined to decide whether or not necessity can be a valid defense to a *section 922(g)* violation.

> 4   In a footnote, the court lists the elements of the crime: "(1) knowing possession of the firearm, (2) a previous felony conviction, and (3) the possession being in or affecting commerce." *Smith,* 160 F.3d at 121-22.

[*13] Other Courts of Appeals have allowed such a defense when a defendant can fulfill certain requirements. For example, the Ninth Circuit requires a defendant to prove that:

> (1) he was under unlawful and present threat of death or serious bodily injury; (2) he did not recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) he had no reasonable legal alternative; and (4) there was a direct causal relationship between the criminal action and the avoidance of the threatened harm.

*Gomez, 92 F.3d at 775; see also Deleveaux, 205 F.3d at 1297* (holding that in extraordinary circumstances, the defense of justification is available to a charge of a *section 922(g)* violation, and applying the same standard as *Gomez*); *United States v. Paolello, 951 F.2d 537, 541 (3d Cir. 1991)* (holding that a common law justification defense is available under *section 922(g)* and applying the same test as *Gomez*). Under any of these standards, however, Gregg's conduct would still not be justified. The need for Gregg to pick up the gun was hardly "compelling" here. *Hescorp, 801 F.2d at 78.* [*14] No one was immediately threatened by the gun to make it a "present threat" to be avoided. *Gomez, 92 F.3d at 775.* Rather, the gun lay amidst debris at the bottom of a set of stairs. (Tr. at 11-12). Moreover, Gregg testified to the grand jury that at the time he discovered the gun (and for the minute afterwards, while he considered taking it), there were no pedestrians within sight. (*Id.* at 12-13).

In addition, Gregg had several reasonable and legal alternative courses of conduct once he discovered the gun. Certainly, when approached by the police on the subway platform, Gregg could have turned over the gun immediately and thereby ceased his unlawful possession. In response to the officers' questioning, Gregg should have produced the gun right away. Alternatively, Gregg could have called 911 from a payphone to alert the authorities that he had found the gun. In this case, the gun did not present an immediate threat to anyone, and Gregg had several alternatives to picking it up and traveling with it. Accordingly, Gregg's request to instruct the jury on the necessity defense is denied.

**B. Innocent Possession**

Gregg also urges the Court to follow the D.C. Circuit's [*15] decision in *Mason,* in which that court ruled that innocent possession of a weapon by a felon is a valid defense to a *section 922(g)* violation. *233 F.3d 619.* According to the *Mason* court, a defendant may establish a defense of innocent possession by demonstrating that (1) the weapon was obtained innocently and with no unlawful purpose and (2) possession of the firearm was transitory. *233 F.3d at 624.* For possession to be considered transitory, it must be evident that "the defendant took adequate measures to rid himself of possession of the firearm as promptly as reasonably possible." *Id.*

In addition, Gregg points to the Second Circuit's opinion in *United States v. Paul,* where the court recognized that possession hypothetically can be too fleeting to be considered criminal in *section 922(g)* cases. *110 F.3d 869, 872 (2d Cir. 1997).* The defendant in *Paul,* a convicted felon, took possession of someone else's gun after that person had shot at him. He then proceeded to fire the gun's bullets into the ground so that they could not cause further harm. While the defendant's possession in *Paul* did not qualify as "too fleeting" to warrant the defense, [*16] the court stated that "cases may be imagined where application of [*section 922(g)*] would be at least highly problematic." *Id.* The court then described a hypothetical in which a police officer's gun falls to the floor, a convicted felon notices it, picks it up, and immediately hands it back to the officer. *Id.* In such a case, fleeting possession could be considered innocent. [5]

> 5   I note that even in the hypothetical case imagined by the *Paul* court, the observer had reasonable and legal alternatives available to him, such as simply telling the officer that the gun had fallen.

I find, however, that the "innocent possession" defense is contrary to both the plain language and the underlying purpose of the statute that Congress enacted. *Section 922(g)* states, "it shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . [to] possess in or affecting commerce, any firearm or

ammunition . . . ." *18 U.S.C. § 922(g)* **[\*17]** . In the penalties section of the firearms law, Congress wrote "whoever *knowingly* violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of *section 922* shall be fined as provided in this title, imprisoned not more than 10 years, or both." *18 U.S.C. § 924 (a)(2)* (emphasis added). *Section 922(g)* does not require that the criminal act be committed with specific intent, but rather with mere knowledge. This stands in contrast to violations of other provisions of the statute, which require that a person act willfully. *See, e.g., 18 U.S.C. § 924(a)(1)(D).*

The difference between acting willfully and acting knowingly is crucial. Generally, when a criminal statute requires that a defendant act willfully, the statute requires that the defendant act with a "bad purpose." *Bryan v. United States, 524 U.S. 184, 191, 141 L. Ed. 2d 197, 118 S. Ct. 1939 (1998).* That is, to act willfully, a defendant must have known that his conduct was against the law. *Id. at 192.* But when a statute only requires that a defendant act knowingly, as does *section 922(g)*, the defendant only need know the facts that constituted **[\*18]** the offense. *Id. at 193.* Thus, to violate *section 922(g)*, a felon only must know that he possesses a gun; his purpose in doing so, whether good or bad, is irrelevant.

Congress' choice of words therefore is significant, as evidenced by the legislative history of the statute. An early version of *section 924(a)* included a willfulness requirement for all violations of the statute. Many legislators, however, felt that for the most serious offenses, including gun possession by felons, the government should not have to prove that the defendant had any intent to violate the law. As a result, the mens rea was reduced to knowledge. *The Firearms Owners' Protection Act,* 17 Cumb. L. Rev. 585, 615-17, 647-48 (1987). Thus, knowing possession of a firearm by a felon--whether innocent or willful--is a violation of *section 922(g).*

Moreover, the Supreme Court has confirmed that "whether, as a policy matter, an exemption [to a statute] should be created is a question for legislative judgment, not judicial inference." *United States v. Rutherford, 442 U.S. 544, 559, 61 L. Ed. 2d 68, 99 S. Ct. 2470 (1979).* Thus, it is not for the courts, but rather for **[\*19]** Congress to create the defense of innocent possession if it so chooses. In fact, Congress created a specific exemption that allows for possession of firearms by those convicted of "offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." *18 U.S.C. § 921(a)(20)(A).* An additional provision exempts antique guns, which are not considered a "firearm" for

the purposes of the statute and, therefore, may be legally possessed by felons. *18 U.S.C. §§ 921(a)(3), (16).* While Congress clearly has decided to create certain exemptions, it notably has not created one for felons who possess a gun innocently, and therefore, I may not recognize one here.

Finally, even if it were recognized, the facts of this case would not warrant the defense of innocent possession under either *Mason,* which I note is not controlling precedent here, or *Paul.* Even if Gregg obtained the gun innocently and possessed it with no unlawful purpose, the second prong of the *Mason* test requires that the possession in question be transitory, and Gregg's possession **[\*20]** clearly was not. *Mason, 233 F.3d at 624.* According to his own testimony to the Bronx grand jury, Gregg carried the gun for several minutes and intended to ride the subway with it. (Tr. at 8-10). Transitoriness turns on whether the defendant "took adequate measures to rid himself of possession of the firearm as promptly as reasonably possible." *Mason, 233 F.3d at 624.* Here, Gregg did not relinquish the gun when the police first approached him, as he could have. Gregg's desire to receive a five hundred dollar reward for the gun does not excuse his failure to turn the gun over to the authorities at the first reasonable opportunity, particularly when he was questioned by the officers. Also, Gregg could have called the police from a public telephone to report picking up the gun but did not do so. Moreover, Gregg's possession was not "too fleeting" to render the application of *section 922(g)* "highly problematic." *Paul,* 110 F.3d at 872. Gregg, who picked up the gun, intended to carry it on the subway to the police station and failed to notify the police officers of its existence, clearly differs from the hypothetical defendant in *Paul* **[\*21]** who merely picked up the gun and immediately returned it to the officer.

Accordingly, because *section 922(g)* does not provide for such a defense and the facts in the instant case are readily distinguishable from those in *Mason* and *Paul,* Gregg is not entitled to an instruction on the "innocent possession" defense.

CONCLUSION

For the foregoing reasons, Gregg's motion to suppress is denied, and his request to charge the jury on the defenses of necessity and innocent possession is denied.

SO ORDERED

August 5, 2002

LORETTA A. PRESKA, U.S.D.J.

LEXSEE 1998 U.S. DIST. LEXIS 1717

**DANIEL ROSSI, Plaintiff, -against- NEW YORK CITY POLICE DEPARTMENT, P.O. KENNETH MARS # 2502 # 889009, P.O. PATRICK SMITH # 26347 # 893663, P.O. WILLIAM HERMANCE # 11702 # 893157, Defendants.**

**94 Civ. 5113 (JFK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 1717*

**February 17, 1998, Decided
February 17, 1998, Filed**

**DISPOSITION:**     [*1] Plaintiff's motion for summary judgment denied, Defendant's motion for summary judgment granted in part and denied in part, and Defendant's motion for leave to amend the answer to add a statute of limitations defense to Plaintiff's purported state law claims granted.

**COUNSEL:** Daniel Rossi, Plaintiff, Pro Se, Alden, NY.

For Defendants: Colleen Martin, Of Counsel, Michael Hess, Corporation Counsel of the City of New York, New York, NY.

**JUDGES:** JOHN F. KEENAN, United States District Judge.

**OPINION BY:** JOHN F. KEENAN

**OPINION**

*OPINION and ORDER*

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Plaintiff's motion for summary judgment, pursuant to *Fed. R. Civ. P. 56*; Defendants' cross-motion for summary judgment, pursuant to *Fed. R. Civ. P. 56*; and Defendants' motion to amend their pleading, pursuant to *Fed. R. Civ. P. 15(a)*. The Court denies Plaintiff's motion for summary judgment, grants Defendants' cross-motion for summary judgment in part and denies the motion for summary judgment in part, and grants Defendants' motion to amend their pleadings.

*Background*

This is an action brought under *42 U.S.C. § 1983* in which Plaintiff alleges that excessive force was [*2] used during his arrest, that he was falsely arrested, falsely imprisoned and maliciously prosecuted in violation of his constitutional rights.

On November 9, 1992, police officers Kenneth Mars, William Hermance and Patrick Smith were assigned to the 61st Precinct Anti-Crime Unit scheduled to perform a 4:00 p.m. to 12:00 a.m. tour. At approximately 8:45 p.m., they were on patrol in the vicinity of East 12th Street in Brooklyn, New York in an unmarked police vehicle. Defendant Officer Mars was the operator of the vehicle. All three officers were in plainclothes. *See* Martin Aff., Ex. A P 3; Pl.'s Aff in Supp., Ex. B at 5, Ex. G.

About that time, Officer Mars observed a dark colored Pontiac Trans Am ("Pontiac") with a broken passenger-side door handle parked on East 12th Street and the Eastbound Service Road of Shore Parkway in Brooklyn, New York. *See* Martin Aff., Ex. A P 4. Officer Mars brought the unmarked police vehicle to a stop at about a 45 degree angle in front of the Pontiac in order to block the Pontiac, and Officer Mars got out of the police car. *See* Pl.'s Aff., Ex. C at 13; Martin Aff., Ex. A P 5. Officer Mars observed that the Pontiac was occupied by a male in [*3] the driver's seat, and a female in the passenger seat. Officer Mars claim that he had his police shield around his neck as he approached the driver's side of the Pontiac. Officer Mars noticed that the steering column of the Pontiac was damaged, and communicated that information to Officers Hermance and Smith, who approached the passenger side of the Pontiac. *See* Martin Aff., Ex. A P 5; Pl.'s Aff. in Supp., Ex. D.

At his deposition, Plaintiff testified that the Pontiac he was in on November 9, 1992 was stolen. Plaintiff in-

dicated that he thought the Pontiac was stolen because "the steering column was cracked and broken." *See* Martin Aff., Ex. B at 12-15. Plaintiff testified that Kathy Borges was seated with him in the Pontiac and that Ms. Borges was a prostitute, known to Plaintiff. Plaintiff claims to have told Ms. Borges that he thought the car was stolen, and Plaintiff testified that he was seated in the vehicle with Ms. Borges for the purpose of "hanging out" and doing drugs. *See* Martin Aff., Ex. B at 15-20. Plaintiff stated that when he saw Defendants' vehicle pull up and the three officers approach the car, he locked the car door, put the car into drive "when I seen [*4] the guns" and told Ms. Borges that he was going to "take off." *See* Martin Aff., Ex. B at 17.

Officer Mars claims to have verbally identified himself as a police officer to the male seated in the driver's seat, later identified as Plaintiff Rossi, and then ordered him out of the vehicle. Plaintiff did not comply with the order. *See* Martin Aff., Ex. A P 6. At his deposition, Plaintiff testified that when Officer Mars approached him at the driver's side he had his gun drawn "in [Plaintiff's] face" and ordered him to step out of the Pontiac by stating "Get the fuck out of the car." Martin Aff., Ex. B at 17, 21. Plaintiff stated that did not know that Officer Mars or the other two men were police officers, that they did not identify themselves as such and that he did not see any police badges or shields. Plaintiff testified that the officers kept screaming "get out of the car, keep your hands in sight, get out of the car." Martin Aff., Ex. B at 17, 21.

According to Officer Mars, after Plaintiff failed to exit the Pontiac, Officer Mars asserts that he tried to open the driver's side door of the Pontiac but it was locked. Officer Mars claims to have then repeated his order for [*5] Plaintiff to step out of the car, but again Plaintiff did not comply. Officer Mars stated that Plaintiff then began to reach under the front seat of the vehicle. *See* Martin Aff., Ex. A P 7. At this point, Officer Mars stated that he extended his hands and revolver inside the vehicle through the partially opened drivers' side window and ordered the driver (Rossi) to place his hands where they could be seen. Simultaneously, with his gun in his right hand, Officer Mars attempted to grab Rossi with his left hand to stop him from reaching under the seat. *See* Martin Aff., Ex. A P 8; Pl.'s Aff in Supp., Ex. B at 3. Officer Mars claims that Rossi grabbed his right hand that held the revolver and pulled him into the Pontiac. A struggle then ensued for control of the gun and a shot discharged unintentionally from the revolver. *See* Martin Aff., Ex. A P 10. The passenger, Kathy Borges, then got out of the Pontiac and Officer Hermance entered the Pontiac from the passenger side door and attempted to shut off the car. *Id.* P 11. Officer Mars claims that Rossi then used the power window button to raise the driver's side window and, as a result, his arms were pinned between the window [*6] and the top of the door thereby preventing him from removing his arms from the car. *Id.* P 12. At this point, Officer Mars stated that Rossi put his foot on the accelerator and the Pontiac "lunged" forward striking the unmarked police car, while Officer Mars was dragged alongside. *Id.* P 13. Officer Mars estimated that the Pontiac travelled about a half block when Rossi caused the Pontiac to make a 180 degree turn to the left, all the while the two men struggled for possession of Officer Mars' gun. During the struggle, Officer Mars claims that another shot was discharged unintentionally from the gun. *Id.* P 13. Thereafter, Officer Mars asserts that Plaintiff caused the Pontiac to crash into the retaining wall of the East 12th Street bridge. Upon impact, the driver's side window was shattered, releasing Officer Mars' arms from the car and causing a third shot to be discharged unintentionally from the gun. The left side of Officer Mars' body struck the wall, causing him to sustain physical injuries that prevented him from returning to work until January 1993. *Id.* P 15. Plaintiff Rossi suffered a tangential gun shot wound to the head, from one of the three discharged bullets. [*7] *Id.* P 16.

According to Plaintiff, after he was ordered out of the car he told the officers "It's not my car." Martin Aff., Ex. B at 21. At the time his hands were on top of the dashboard, one on each side of the wheel, and the driver's side window was half way open. *Id.* at 25, 27. He then took his hands off the dash and put the car in drive with his right hand, while placing his left hand on the steering wheel. *Id.* at 24, 28, 31; Pl.'s Resp. P 17. At that time the passenger door opened and Plaintiff asserts that Kathy Borges was dragged out of the car and someone jumped into the car, later identified as Officer Hermance. *See* Martin Aff., Ex. B at 28. Plaintiff stated that after Kathy Borges got out of the car, his head was out of the driver's side window because Officer Mars was pulling him out of the car window by his jacket, and that Officer Mars was slapping him in the head with the gun as the car was moving. *Id.* at 28; Pl.'s Resp. P 17. Plaintiff testified that the Pontiac then crashed into the police car, and at about the same time Officer Mars hit him with the gun and the gun went off. Plaintiff testified that Officer Mars started screaming "I shot him. I [*8] shot him," that Plaintiff felt "like my head was hit with a hammer," that Officer Mars let go of Plaintiff and Plaintiff then "floored the car" after Mars let go. Martin Aff., Ex. B at 17, 28; Pl.'s Response P 17. Plaintiff claims that he never rolled up the driver's side window on Officer Rossi's arms and that his hand never touched Officer Mars' gun. *See* Martin Aff., Ex. B at 31-32; Pl.'s Resp. P 15. After he "floored the car." Plaintiff stated that he made a left turn, that the car was forced to a stop by something "blocking the road", and the gears got locked in park and

Plaintiff passed out. Martin Aff., Ex. B at 32; Pl.'s Resp. P 19. Plaintiff spent about a week in the hospital for the gun shot that grazed his head. See Martin Aff., Ex. B. at 52.

At his deposition, Plaintiff testified that he had no physical contact with Officers Hermance or Smith during the encounter. See Martin Aff., Ex. B at 31. Plaintiff also testified that, upon reflection, he did not think that Officer Mars intended to shoot him, but that he "made a mistake" or "panicked" because "everything happened so quick." Id. at 53. However, in his papers opposing Defendants' summary judgment motion, [*9] Plaintiff attempts to explain this deposition testimony and states that he "cannot say what was someone elses [sic] intentions no more then [sic] you could say what his are. What Mr. Rossi did say was what he hopes the defendant had on his mind since he is an officer of the law and if you ask me to answer the same question on the night of Nov. 9, 1992, I would say the guy tried to kill me and steal the car I was asked to hang out in." Pl.'s Resp. P 26.

As a result of the November 9, 1992 incident, on February 17, 1994, Plaintiff pleaded guilty to the class D felony of criminal possession of stolen property in the third degree. See Martin Aff., Ex. D. By notice dated February 26, 1994, Plaintiff attempted to withdraw his plea of guilty on the grounds that he was misinformed and that he possessed additional facts to support his innocence. By memorandum date May 27, 1994, New York State Supreme Court Justice Maurice Brill denied Plaintiff's motion to withdraw his plea of guilty. See Martin Aff., Ex. E.

Plaintiff filed a Notice of Claim against the City of New York on February 4, 1993. Martin Aff., Ex. F. Plaintiff initiated this § 1983 action by filing a Complaint on July [*10] 13, 1994.

## Discussion

A motion for summary judgment may be granted under Fed. R. Civ. P. 56 if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). "Summary judgment is proper when reasonable minds could not differ as to the import of the evidence before the court." Cable Science Corp. v. Rochdale Village, Inc., 920 F.2d 147, 151 (2d Cir. 1990). When viewing the evidence the Court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Delaware & Hudson Railway Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990). Although the movant initially bears the burden of showing that there are no genuine issues of material fact, once

such a showing is made, the party opposing a properly supported motion must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.

### A. Plaintiff's Rule 56 Motion

The Court denies Plaintiff's motion for summary [*11] judgment at this time because he has failed to comply with Local Civil Rule 56.1 of the Southern District of New York. [1] Specifically, Plaintiff did not annex "to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." Pursuant to the Local Civil Rule, "Failure to submit such a statement may constitute grounds for denial of the motion." Plaintiff has not complied with the Local Civil Rule, and in the absence of such a statement the Court cannot glean from Plaintiff's papers that no material factual dispute exists and that he is entitled to judgment on his § 1983 claims as a matter of law. The motion is therefore denied. In any event, had that Plaintiff submitted such a statement, the Court still would have denied his motion for summary judgment for the reasons discussed infra.

1    Formerly known as Local Civil Rule 3(g).

### B. Defendants' Cross-Motion for Summary Judgment

#### 1. False Arrest, False Imprisonment [*12] and Malicious Prosecution Claims

In a § 1983 action for false arrest, false imprisonment or malicious prosecution, a plaintiff must demonstrate that his arrest was made without probable cause. See Baker v. McCollan, 443 U.S. 137, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979). It is well settled, however, that where a plaintiff has been convicted, in order to recover damages for such a constitutional violation a plaintiff must prove that his conviction or sentence has been reversed on appeal. See Heck v. Humphrey, 512 U.S. 477, 486-87, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994); Woods v. Candela, 47 F.3d 545, 546 (2d Cir. 1995); Berman v. Turecki, 885 F. Supp. 528, 532 (S.D.N.Y. 1995). As the Supreme Court held in Heck,

in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called

into question by a federal court's issuance [*13] of a writ of habeas corpus, *28 U.S.C. § 2254.* A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under *§ 1983.* Thus, when a state prisoner seeks damages in a *§ 1983* suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Heck, 512 U.S. at 486-87, 129 L. Ed. 2d 383, 114 S. Ct. 2364.* The reason for this requirement is to avoid parallel litigation over issues of probable cause and guilt. *Id. at 484.*

Plaintiff cannot prove that his conviction or sentence has been reversed on appeal or expunged by executive order. Plaintiff pleaded guilty to the crime of criminal possession of stolen property in the third degree, and by this guilty plea he waived all of his rights to challenge his arrest and conviction under *§ 1983. See Berman, 885 F. Supp. at 533.* Thus, Plaintiff cannot meet the requirements set forth by the Supreme Court in *Heck,* and his claims for [*14] false arrest, false imprisonment and malicious prosecution must be dismissed as a matter of law. This *§ 1983* action alleging lack of probable cause in Plaintiff's November 9, 1992 arrest and imprisonment is no more than a collateral attack on his conviction, and such an attack is impermissible in this case.

Additionally, by pleading guilty, Plaintiff is barred by the doctrine of collateral estoppel from relitigating the issue of probable cause to arrest. *See Berman, 885 F. Supp. at 533.* Indeed, "A guilty plea 'disposes of any issue pertaining to the constitutionality of plaintiff's arrest, interrogation, search and prosecution.'" *Berman, 885 F. Supp. at 533* (quoting *Reese v. York, 571 F. Supp. 1046, 1048 (N.D. Tex. 1983)).* Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's *§ 1983* claims for false arrest, false imprisonment and malicious prosecution.

## 2. Whether the Claims against the New York City Police Department, Officer Hermance and Officer Smith Must be Dismissed as a Matter of Law

As defense counsel points out, the New York City Police Department is an organizational subdivision of the City of New York, lacking independent [*15] legal existence and as such is not a suable entity. *See East Coast*

*Novelty Co., Inc. v. City of New York, 781 F. Supp. 999, 1010 (S.D.N.Y. 1992); Wilson v. city of New York, 800 F. Supp. 1098, 1101 (E.D.N.Y. 1992).* Section 396 of the New York City Charter requires "all actions and proceedings for the recovery of penalties . . . be brought in the name of the City of New York, and not that of any agency, except where otherwise provided by law." *See Jolly v. New York City Dep't of Corrections, 1989 U.S. Dist. LEXIS 14852, 89 Civ. 4520 (JFK), 1989 WL 153053, at *4 (S.D.N.Y. Dec. 13, 1989)* (relying on § 396 of the New York City Charter and dismissing the action against the New York City Department of Correction). Accordingly, the Complaint is dismissed as against the New York City Police Department.

As for Defendants Hermance and Smith, the Court also agrees with defense counsel that the Complaint should be dismissed as against them because there are no allegations of their "personal involvement" with respect to the excessive force claim. To establish individual liability under *42 U.S.C. § 1983,* a complaint must allege that the defendant was personally involved in the occurrence, *Williams v. Smith,* [*16] *781 F.2d 319, 323 (2d Cir. 1986),* or that the defendant actually caused the deprivation of the constitutional right in question. *Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 691-92, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).* Because there are no allegations of Defendants Hermance's and Smith's personal involvement in the acts giving rise to the excessive force claim, which is the only remaining claim against them in the Complaint, the Court dismisses the Complaint against Defendants Hermance and Smith.

## 3. Excessive Use of Force Claim

Defense counsel argues that the *§ 1983* claim for excessive force cannot stand because the undisputed facts show that Officer Mars' discharge of the revolver was negligent and negligent conduct is not actionable under the *due process clause of the Fourteenth Amendment.* In the alternative, defense counsel argues that Officer Mars is entitled to summary judgment on the excessive force claim because even assuming that Officer Mars intentionally fired—which he claims he did not—his actions were objectively reasonable and no rational jury would find that he acted unreasonably. As defense counsel puts it, "No reasonable [*17] juror could find that Officer Mars was not within his right to discharge his weapon when confronted with the operator of a stolen vehicle, who refused to keep his hands in plain view, reached under the seat, struggled for the officer's weapon, and attempted to speed away from the scene with Defendant Mars dangling helplessly from the driver's side window."

The Court denies this motion for summary judgment because material factual disputes exist as to whether Of-

ficer Mars' conduct was merely negligent and whether the version of events set forth by defense counsel is what actually occurred. Specifically, as discussed *supra*: Plaintiff stated in his response papers that he thinks Officer Rossi may have intended to shoot him and that his after-the-fact statement in the deposition was taken out of context; Plaintiff testified at his deposition that neither Officer Rossi nor the other two officers identified themselves to Plaintiff as police officers; that Officer Rossi pointed his gun in Plaintiff's face when he approached the driver's side; that Plaintiff did not reach under the seat but used his right hand to put the car into drive when he was told to get out by a man with a gun pointed [*18] at him; that he did not struggle for Officer Mars' gun or even touch the weapon; that Officer Mars tried to pull Plaintiff out of the car and was slapping him in the head with the gun; that Plaintiff never raised the window of the car on Officer Mars' arms; that rather than Officer Mars being pinned to the Pontiac door by the closed window, Officer Mars was grabbing Plaintiff's jacket as the vehicle moved; and that Officer Mars was not dragged by the car into a wall but let go of Plaintiff's jacket when the Pontiac hit the police car. Plaintiff also offered a police report in which Officer Hermance indicated that Rossi had his right hand on the steering column at all times and his left hand on his lap, and that Rossi did not reach under the seat. *See* Pl.'s Aff. in Supp., Exs. D-E. Officer Hermance also indicated that Officer Mars reached in the window with his gun. *See id.* Ex. E. Plaintiff also argues that Officer Mars' story regarding a struggle for the gun as the car moved does not ring true when viewed with the evidence that Officer Hermance was in the car during this struggle and that Plaintiff's hands were on the steering wheel as the car moved. Additionally, Plaintiff [*19] submitted Officer Mars' grand jury testimony in which he testified that the third shot fired from his revolver hit Plaintiff. *See* Pl.'s Aff. in Supp., Ex. B at 4-5. Viewing the evidence in the light most favorable to Plaintiff, as well as considering his pro se status when viewing his papers in response to this summary judgment motion, the Court concludes that there are material factual disputes in this case which bear directly on whether Defendant Mars' conduct was simple negligence and whether Defendant Mars' use of force in discharging the gun three times during Plaintiff's arrest was objectively reasonable under the circumstances.

## 4. Whether Defendant Mars Is Entitled to Qualified Immunity

Defense counsel argues that Defendant Mars is entitled to qualified immunity because "no reasonable officer

placed in Defendant Mars' position could be expected to act differently." Defs.' Mem. in Supp. at 18. However, for the reasons this Court denied the motion for summary judgment on the excessive force claim, the Court finds that material factual disputes exist on the issue of qualified immunity and whether Officer Mars' actions were objectively reasonable under the circumstances [*20] of this case.

## C. Defendants' *Rule 15(a)* Motion

In Plaintiff's affidavit in support of his motion for summary judgment on his claims, Plaintiff appears to assert state law claims for negligence that were not asserted in the Complaint. *See* Pl.'s Aff. in Supp. PP 3, 13. Consequently, Defendants seek leave to amend the answer to add a statute of limitations defense to Plaintiff's purported state law claims, which Plaintiff raises for the first time. Defendants argue that because Plaintiff failed to commence this action within a year and ninety days of the subject incident, all of Plaintiff's state law claims are barred by the statute of limitations. The Court observes that no state law claims are asserted in the Complaint and, therefore, there are no state law claims in this lawsuit. Nevertheless, the Court grants Defendants leave to amend their answer to add a statute of limitations defense to Plaintiff's purported state law claims.

## Conclusion

For the reasons discussed above, the Court denies Plaintiff's motion for summary judgment, grants Defendant's motion for summary judgment in part and denies Defendant's motion for summary judgment in part, and grants [*21] Defendants' motion for leave to amend the answer to add a statute of limitations defense to Plaintiff's purported state law claims. The Court sets a ready for trial date of April 27, 1998. Pre-trial materials, as described in the attached "Pre-Trial Requirements of Judge John F. Keenan," are due no later than April 13, 1998.

The Court further directs that this case be added to the list of those cases awaiting pro bono counsel.

**SO ORDERED.**

**Dated: New York, New York**

**February 17, 1998**

**JOHN F. KEENAN**

**United States District Judge**